Filed 10/31/24; On remand
## CERTIFIED FOR PARTIAL PUBLICATION†

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WEST ADAMS HERITAGE ASSOCIATION et al., | B319121 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 20STCP00916) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent; | |
| ROBERT CHAMPION et al., | |
| Real Parties in Interest and Respondents. | |

---

† Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication, with the exception of parts F, G, and H of the Discussion.

APPEAL from a judgment of the Superior Court of Los Angeles County, Kevin Clement Brazile, Judge. Reversed and remanded with instructions.

Chatten-Brown, Carstens & Minteer, Carstens, Black & Minteer, Douglas P. Carstens, Amy Minteer, Michelle N. Black and Sunjana Supekar for Plaintiffs and Appellants.

Hydee Feldstein Soto, City Attorney, John W. Heath and Terry P. Kaufmann Macias, Assistant City Attorneys, Valerie L. Flores, Chief Deputy City Attorney, Parissh A. Knox, Deputy City Attorney; Meyers Nave, Amrit S. Kulkarni, Shaye Diveley and Mina Arasteh for Defendant and Respondent.

DLA Piper, A. Catherine Norian, Kyndra Joy Casper and Andrew Brady for Real Parties in Interest and Respondents.

_____

This case is before us on transfer from the Supreme Court with instructions to vacate our decision and reconsider the cause in light of Assembly Bill No. 1307 (Stats. 2023, ch. 160, § 1) and *Make UC A Good Neighbor v. Regents of University of California (Resources for Community Development)* (2024) 16 Cal.5th 43 (*Make UC II*).

West Adams Heritage Association and Adams Severance Coalition (collectively, appellants) appeal from the denial of a writ of mandate. Appellants sought to set aside a determination by the City of Los Angeles (the City)[1] that a proposed residential

_____

[1] The respondents' briefing in this matter was filed jointly by the City of Los Angeles and real parties in interest Robert Champion, Champion Real Estate Company, and 806 West Adams Property, LLC. We refer to the City and real parties collectively as "respondents."

2

housing development (the project) near the University of Southern California (USC) was exempt from environmental review under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA).

The City found the project was subject to a Class 32 exemption for urban in-fill developments.  Appellants argue this finding was an abuse of discretion because the City failed to find the project was consistent with the applicable redevelopment plan for the project area; the City relied on mitigation measures to conclude residents congregating and listening to music on the project's rooftop decks would not cause significant noise impacts; and the record fails to show the project would not have significant adverse impacts on traffic safety.

Appellants further argue several exceptions to the Class 32 exemption apply, because the project would adversely impact nearby historical resources, the rooftop decks constitute an unusual circumstance that will have a significant effect on the environment, and the cumulative environmental impact of the project and similar projects is significant.

The trial court rejected all of appellants' challenges to the project and denied their writ petition.  Our original decision reversed the trial court, holding the City improperly relied on mitigation measures when concluding the project's rooftop decks would not cause significant noise impacts.  We agreed with the trial court, however, that appellants had failed to demonstrate the City abused its discretion in concluding the project will not have significant impacts on traffic or historical resources, either by itself or cumulatively with other similar projects.  We did not reach appellants' arguments regarding redevelopment plan consistency or the unusual circumstance exception.

Assembly Bill No. 1307 enacted Public Resources Code section 21085, which provides that when evaluating "residential projects" under CEQA, "the effects of noise generated by project occupants and their guests on human beings is not a significant effect on the environment." *Make UC II* applied that section to reverse a lower court holding that an environmental impact report for a student housing project and development plan was deficient for failure to consider the environmental impact of noise generated by student residents. (*Make UC II*, *supra*, 16 Cal.5th at pp. 48–49.)

Applying these new authorities, we hold the noise concerns advanced by appellants do not constitute a significant environmental effect impeding application of the Class 32 exemption. Appellants' invocation of the unusual-circumstance exception similarly is premised on noise from the rooftop decks, and Public Resources Code section 21085 and *Make UC II* defeat that challenge as well.

Because occupant noise no longer is a reason to reject the Class 32 exemption, we reach appellants' alternative contention that the City has failed to assess whether the project is consistent with the applicable redevelopment plan. A project is entitled to a Class 32 exemption only if it is consistent with the applicable zoning regulations. Appellants argue the redevelopment plan provides the zoning regulations for the project at issue here.

*Make UC II* counsels we apply current law in this writ proceeding. Under Los Angeles Municipal Code (LAMC) section 11.5.14, which was enacted in 2019 after the City granted the Class 32 exemption at issue in this case, the redevelopment plan supersedes any conflicting provisions of the generally applicable zoning ordinance. LAMC section 11.5.14 thus effectively

4

incorporates the redevelopment plan into the zoning ordinance to the extent the plan and the ordinance conflict. The City therefore cannot grant a Class 32 exemption without first finding the project is consistent not only with the generally applicable zoning ordinance, but also with the redevelopment plan.

The City has yet to determine whether the project is consistent with the redevelopment plan. Appellants therefore are entitled to a writ setting aside the grant of the Class 32 exemption pending that determination, which the City has represented it must do anyhow to approve a building permit for the project. We reverse the trial court and remand solely for the purpose of the City conducting that analysis.

Appellants further ask us to hold the project is ineligible for a Class 32 exemption because the City calculated the project's allowable density and density bonus based on the generally applicable zoning ordinance rather than the redevelopment plan, which is more restrictive. Respondents contend the City correctly concluded the zoning ordinance, not the redevelopment plan, was the controlling land use provision for purposes of calculating density and the density bonus.

We agree with respondents. Under the current version of the state density bonus law, the City must apply the bonus to the greatest maximum residential density allowed under the City's general plan, specific plan, or zoning ordinance *at the time the developer applies for the density bonus*. Although we conclude LAMC section 11.5.14 incorporates the redevelopment plan into the zoning ordinance, that provision was not in effect when respondent developers applied for the density bonus in this case. Under state law, then, the City's zoning ordinance, which provides a higher maximum allowable density than the

redevelopment plan, is the applicable zoning for purposes of the density bonus. The fact the project's density bonus is inconsistent with the redevelopment plan is thus not grounds to deny a Class 32 exemption. We further conclude the state density bonus law preempts the redevelopment plan to the extent the plan imposes additional requirements before the City can grant a density bonus.

We also reject appellants' argument, raised in their supplemental brief following transfer from the Supreme Court, that respondents' representations concerning the subject property in a separate lawsuit have mooted this appeal.

Assembly Bill No. 1307 or *Make UC II* do not affect our holdings in our original opinion rejecting appellants' arguments concerning traffic, historical resources, and cumulative impact. The parties do not contend otherwise. In the unpublished section of this opinion, we reiterate those holdings.

## BACKGROUND

We provide here general background facts. We provide additional relevant background in each issue's respective section of our Discussion, *post*.

The project site is a 2.8 acre lot on the southeast corner of West Adams Boulevard and Severance Street, less than one mile from the USC campus. At the time of the City's approvals, the project site was occupied by a parking lot and a two-story building used by USC as an office, childcare, and classroom facility. The site is zoned RD1.5-1 with a Low Medium II Residential land use designation under the South Los Angeles Community Plan.

As described in the City's notice granting the Class 32 CEQA exemption, "Adjacent land uses include a four-story

6

residential building to the west across Severance Street, a three-story residential building to the north across Adams Boulevard, a two-story commercial building on the adjacent property to the east, and two and one-story residential and educational buildings to the south owned by [USC]."

The proposed project would demolish the existing building and parking lot and replace them with a residential apartment complex consisting of seven buildings. Six of the buildings would be three-story buildings atop a single-level podium parking structure, for a total of four stories. Combined, the six buildings would contain 100 five-bedroom apartments and 2 three-bedroom apartments for a total of 102 units.[2] Five of the units would be restricted affordable units for very low income households. The seventh building would be a four-story clubhouse providing "a variety of resident-serving amenities."

The project would include outdoor amenity spaces including a swimming pool on top of the podium parking structure, and "private amenity spaces" on the building roofs "that would include landscaping and outdoor lounge and cooking areas."

Following evaluation of the project and a public hearing, a City zoning administrator issued a determination letter on May 17, 2019 finding the project was subject to a Class 32 exemption from CEQA, and no exceptions to the exemption applied. The zoning administrator also approved a conditional use permit and a density bonus.

---

[2] An earlier version of the proposed project consisted of 99 five-bedroom units and no three-bedroom units. Some City approvals were based on that earlier design. The difference is not material to this appeal.

The zoning administrator denied a site plan review, however, finding the project as proposed was not compatible with surrounding uses.  The project was "unique in size" for the area and the "scale and massing, in addition to the podium level [i.e., the parking structure] add to a development that would not be comparable to any residential project in the immediate area." The zoning administrator had concerns about the aesthetics and architectural limitations created by the podium parking.  The zoning administrator also found the private rooftop amenity spaces, which the zoning administrator referred to as "rooftop decks," "would create uses that would be atypical of surrounding development, and bring in active uses on the rooftops of each of the seven buildings that would potentially affect surrounding uses through noise and music.  [¶]  . . . In addition to the height and massing [of the project], though not deviating from the [building code], the rooftop amenity would overwhelm those multi-family structures immediately abutting the subject project on Severance Street . . . ."

Jim Childs, a member of the public who objected to the project, filed an appeal to the City planning commission challenging the zoning administrator's grant of the CEQA exemption, conditional use permit, and density bonus.  The project applicants also appealed, challenging the denial of a site plan review.

While the appeals were pending, the project applicants submitted revised plans to address the zoning administrator's concerns.  Among other things, the revised plans changed the architectural style from modernist to craftsman, and added features "to more fully screen the parking podiums from the abutting pub[l]ic right-of-ways."  The revisions also moved the

8

"rooftop amenities away from the perimeter of the building to minimize impacts on neighboring properties." In light of these revisions, the zoning administrator stated that, although the earlier denial of a site plan review was not in error, the revised plans fully addressed the concerns regarding the project's compatibility with the neighborhood.

The planning commission granted the project applicants' appeal and overturned the zoning administrator's earlier denial of a site plan review, concluding, as had the zoning administrator, that the revised project "would be compatible with current uses in the immediate area."

On October 10, 2019, the planning commission denied Childs's appeal, determining the project was subject to a Class 32 CEQA exemption, and the zoning administrator had correctly granted a conditional use permit and density bonus.

Childs appealed to the city council. On February 4, 2020, the city council denied the appeal, determined the project was subject to a Class 32 CEQA exemption, and adopted the findings of the planning commission.

Appellants, two organizations representing, inter alia, households, businesses, and others in the project area, filed a petition in the trial court for a writ of mandate reversing the City's approval of the project, and naming as real parties in interest the project applicants. The petition alleged that the City had failed to establish the project was exempt from CEQA, and that the approvals did not comply with state planning and zoning law or the City's municipal code.

The trial court denied the petition. Because our review is of the City's decision, not the trial court's ruling, we deem it unnecessary to summarize the basis of the trial court's ruling.

Appellants timely appealed.  We reversed the trial court in an unpublished opinion, concluding the zone administrator's noise findings precluded application of the Class 32 exemption. (*West Adams Heritage Association v. City of Los Angeles* (Aug. 10, 2023, B319121) [nonpub. opn.].)  The Supreme Court granted review, and ordered us to vacate our decision and reconsider the cause in light of Assembly Bill No. 1307 and the *Make UC II* decision.[3]

## DISCUSSION

Appellants do not challenge the trial court's rejection of their claims that the project approvals did not comply with state planning and zoning law or the municipal code.  Appellants' arguments on appeal pertain solely to the City's application of the Class 32 CEQA exemption.  As we explain, our original conclusion that noise concerns barred application of the exemption is no longer valid in light of a statute and Supreme Court authority postdating our opinion.  We agree, however, with appellants' alternative contention that the City failed to conduct the required redevelopment plan consistency analysis before granting the Class 32 exemption, and appellants are entitled to a writ on that sole basis.[4]

---

[3] After transfer from the Supreme Court, the parties have requested we take judicial notice of numerous documents.  We grant respondents' August 8, 2024 and appellants' August 22, 2024 requests for judicial notice in full.  We grant respondents' September 10, 2024 request for judicial notice as to exhibits B through G, but deny the request as to exhibit A.

[4] As set forth in Discussion, part E(5), *post*, the City did not err in determining that the zoning ordinance in effect at

## A. Applicable Law

CEQA "establishes a comprehensive scheme to provide long-term protection to the environment.  It prescribes review procedures a public agency must follow before approving or carrying out certain projects." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1092 (*Berkeley Hillside*).)  "Under CEQA and its implementing guidelines, an agency generally conducts an initial study to determine 'if the project may have a significant effect on the environment.' [Citation.]" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 945 (*San Mateo Gardens*).)  "If there is substantial evidence that the project may have a significant effect on the environment," then the agency must prepare an environmental impact report before approving the project.  (*Ibid.*)

"For policy reasons, the Legislature has expressly exempted several categories of projects from review under CEQA. [Citation.]  By statute, the Legislature has also directed the Secretary of the Natural Resources Agency . . . to establish 'a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from' CEQA." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1092, quoting Pub. Resources Code, § 21084.)  "If an exemption applies, the project is excused from environmental review." (*Arcadians for Environmental Preservation v. City of Arcadia* (2023) 88 Cal.App.5th 418, 429 (*Arcadians*).)

---

the time the project was approved, and not the redevelopment plan, governed the density and density bonus calculation for the project.

11

In the instant case, the City concluded the project qualified for a Class 32 CEQA exemption, defined under California Code of Regulations, title 14, section 15332.[5]  The Class 32 exemption applies to "in-fill development" meeting certain conditions, specifically:  "(a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations.  [¶]  (b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.  [¶]  (c) The project site has no value, as habitat for endangered, rare or threatened species.  [¶]  (d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality.  [¶]  (e) The site can be adequately served by all required utilities and public services." (§ 15332.)

The Class 32 exemption is subject to certain exceptions. (§ 15300.2.)  As relevant to this appeal, the exemption does not apply if "the cumulative impact of successive projects of the same type in the same place, over time is significant"  (*id.*, subd. (b)); if "there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances" (*id.*, subd. (c); or if the project "may cause substantial adverse change in the significance of a historical resource" (*id.*, subd. (f)).

---

[5]  Further unspecified citations are to title 14 of the California Code of Regulations.  Section 15000 et seq. of that title are also referred to as the "CEQA Guidelines."  (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2 (*Muzzy Ranch Co.*).)

## B.    Standard of Review

"On appeal from denial of a petition for writ of administrative mandamus, we review the agency's decision, not the superior court's, to determine whether the agency has prejudicially abused its discretion.  [Citation.]  An abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence.  [Citations.]  We exercise our independent judgment to determine whether the agency employed proper procedures and review the agency's factual findings for substantial evidence." (*Arcadians, supra,* 88 Cal.App.5th at p. 428.)

We review an agency's factual determination that a project falls within a statutory or categorical CEQA exemption for substantial evidence.  (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 410.)  "In applying the substantial evidence standard of review, all conflicts in the evidence are resolved in favor of the prevailing party and all legitimate and reasonable inferences are made to support the agency's decision." (*Ibid.*)

We review questions of statutory interpretation de novo. (*Make UC II, supra,* 16 Cal.5th at p. 55.)  We " ' "adopt the construction that best gives effect to the Legislature's intended purpose." [Citation.] . . . .' [Citation.]" (*Ibid.*)  " ' "We consider first the words of a statute, as the most reliable indicator of legislative intent." [Citation.]  In doing so, we give the words "their usual and ordinary meaning," viewed in the context of the statute as a whole. [Citation.] . . . .' [Citation.]" (*Ibid.*)  " 'When the language of a statute is ambiguous—that is, when the words of the statute are susceptible to more than one reasonable meaning, given their usual and ordinary meaning and considered

in the context of the statute as a whole—we consult other indicia of the Legislature's intent, including such extrinsic aids as legislative history and public policy. . . . [Citations.]' [Citation.]" (*Ibid.*)

We discuss the standard of review for the City's findings regarding the various exceptions to the exemption in the applicable sections, *post*.

## C.     This Appeal Is Not Moot

Appellants contend that assertions made by respondents in separate litigation render this appeal "arguably moot." We reject this argument.[6]

During the pendency of the instant appeal, the project developers alternatively sought approval from the City for a smaller 52-unit development constructed on only one of the two parcels intended for the larger 102-unit development at issue in this case. The City concluded the smaller project was exempt from CEQA review under the exemption for ministerial projects. Appellants challenged that decision by writ petition just as they have in the instant matter. (See Super. Court Los Angeles County, case No. 23STCP01363.) Appellants argued, inter alia, that the developers still intended to build the larger project, but

---

[6] On our own motion, we take judicial notice of the trial court's May 31, 2024 judgment in *West Adams Heritage Association et al. v. City of Los* Angeles (Super. Ct. Los Angeles County) case No. 23STCP01363, which sets forth the factual and procedural history of that case. The trial court denied appellants' writ, and appellants have appealed in case No. B339952, in which briefing has yet to commence. The judge in case No. 23STCP01363 was not the same judge who ruled on the writ petition in the instant case.

were improperly segmenting it into smaller projects to evade CEQA review.

Respondents in this case (the developers and the City) opposed the writ petition in case No. 23STCP01363. In responding to the segmentation argument, respondents contended the original 102-unit project and the proposed 52-unit project were mutually exclusive of one another, and if one were built the other could not be built. The trial court agreed there was no improper segmenting finding, "(1) Both projects cannot be built; (2) There are significant design differences between the two projects; (3) There is no evidence in the record of any coordinated or future development of the adjacent parcel; and (4) The procedural history does not support any claim of segmenting."

In the instant matter, appellants base their mootness argument on two statements by respondents in opposing the writ petition in case No. 23STCP01363. First, respondents asserted they had severed the "lot tie" connecting the two parcels, and therefore "the 102-Unit Development could not be built because it would span two different, individually sellable lots." Respondents also asserted the two projects "are separate developments that differ in virtually every aspect of design, including, among others, their location on the site, building typology, site plan, number of buildings, building footprints and layouts, number of units, unit design and configuration, unit sizes and bedroom counts, parking design and number of spaces, vehicular access and circulation, and open space areas and design."

Appellants argue the current appeal is moot because, first, "[d]ue to termination of the lot tie, the 102-unit Project at issue in this action can no longer be developed," and second, "because

15

Respondents claimed in a court filing that the 102-unit Project can no longer be constructed, they are judicially estopped from arguing the 102-unit Project can still move forward."

We disagree with appellants' characterization of respondents' statements. Respondents were answering appellants' contention of improper segmenting by arguing construction of the 52-unit project would make it impossible to expand it into the original 102-unit project or something similar. Respondents were not arguing it was impossible, as a general matter, to build the 102-unit project, just that the two proposed projects were mutually exclusive. Whether as a legal matter severance of the lot tie makes the larger project impossible is not an issue properly before us, but appellants cite nothing that persuades us respondents have given up on the 102-unit project or made such a representation to the trial court. Thus, the instant appeal is not moot.

**D.    Under Assembly Bill No. 1307 and *Make UC II*, the Noise Issues Identified by the Zoning Administrator Do Not Constitute a Significant Effect on the Environment**

Our original opinion noted the zoning administrator's finding that the project's "abundant" and "atypical" roof decks "would potentially affect surrounding uses through noise and music," and "overwhelm those multi-family structures immediately abutting the subject project." We concluded this was effectively a finding that the project would "result in . . . significant effects relating to . . . noise" (§ 15332, subd. (d)), thus

barring application of the Class 32 exemption.[7]  We relied in part on *Make UC A Good Neighbor v. Regents of University of California* (2023) 88 Cal.App.5th 656 (*Make UC I*), reversed by *Make UC II*, *supra*, 16 Cal.5th 43, which at the time, was pending review before the Supreme Court.

As we explain, our original holding cannot stand in light of Assembly Bill No. 1307 and *Make UC II*.

### 1.    The *Make UC* decisions and Assembly Bill No. 1307

*Make UC I* concerned the adequacy of an environmental impact report (EIR) covering both a student housing project at the University of California, Berkeley and the university's long range development plan.  (*Make UC I*, *supra*, 88 Cal.App.5th at pp. 664–665.)  Opponents of the project and development plan argued, inter alia, that the EIR "failed to analyze potential noise impacts from loud student parties in residential areas near the campus, where student parties have been a problem for years." (*Id.* at p. 685.)

The First District Court of Appeal agreed the EIR was inadequate.  The court noted the University of California Regents "concede[d] that CEQA applies to the type of noise at issue here— crowds of people talking, laughing, shouting, and playing music that disturbs neighboring residents."  (*Make UC I*, *supra*,

---

[7] We recognized in our original opinion that the zoning administrator in fact granted the CEQA exemption, and raised the noise concerns in the separate context of a site plan review. We concluded the grant of the CEQA exemption could not be reconciled with the noise findings, whatever the context in which those findings arose.

17

88 Cal.App.5th at p. 685.)  The court further observed the record indicated noise from student parties was "a long-standing problem," citing findings by the City of Berkeley and efforts by the City of Berkeley and the university to deal with the issue over the years.  (*Id.* at p. 686.)  Given this record, the court rejected the Regents' argument that the noise concern was based on speculation and "antistudent bias."  (*Id.* at pp. 687, 689.)  The court held the Regents "must analyze the potential noise impacts relating to loud student parties," and "determine whether the potential noise impacts are in fact significant, and, if so, whether mitigation is appropriate."  (*Id.* at p. 690.)

Our Supreme Court granted review.  While review was pending, the Legislature passed Assembly Bill No. 1307, which enacted Public Resources Code section 21085.  (Stats. 2023, ch. 160, § 1.)  That section provides, "For purposes of this division, for residential projects, the effects of noise generated by project occupants and their guests on human beings is not a significant effect on the environment."  (Pub. Resources Code, § 21085.)  "[T]his division" refers to division 13 of the Public Resources Code, which codifies CEQA.  (*Del Cerro Mobile Estates v. City of Placentia* (2011) 197 Cal.App.4th 173, 183.)

The Supreme Court then issued its decision in *Make UC II*.  The project opponents conceded Assembly Bill No. 1307 applied to the case, and that under the new law, the EIR did not have to analyze the impact of " 'social noise' " created by the housing project.  The Supreme Court understood the project opponents to "use the term 'social noise' to refer to noise generated by human voices during social interactions."  (*Make UC II*, *supra*, 16 Cal.5th at p. 49 & fn. 2.)

18

The Supreme Court accepted these concessions. It stated, first, that "[i]n mandamus proceedings, a reviewing court applies the law that is current at the time of judgment in the reviewing court," there, the newly enacted Public Resources Code section 21085. (*Make UC II*, *supra*, 16 Cal.5th at p. 55.) It further held, "It cannot be said that the 2021 EIR is inadequate for having failed to study the effects of social noise associated with [the student housing project], when no such analysis is required under [Public Resources Code] section 21085." (*Make UC II*, at p. 57.)

Although the project opponents conceded Assembly Bill No. 1307 defeated their noise challenge to the housing project, they argued the university's long range development plan was not a "residential project" within the meaning of Public Resources Code section 21085, and therefore the EIR must consider "the environmental impacts of social noise resulting more broadly" from the development plan. (*Make UC II*, *supra*, 16 Cal.5th at p. 57.)

The Supreme Court rejected this argument, concluding "the Legislature intended for [Public Resources Code] section 21085 to apply to the 2021 EIR's evaluation of the residential aspects of the [long range development plan]". (*Make UC II*, *supra*, 16 Cal.5th at p. 61.) The court observed, "The legislative history of Assembly Bill 1307 overwhelmingly establishes that the Legislature enacted the new law to abrogate the [*Make UC I*] decision." (*Make UC II*, at p. 60.) The court further noted, "[T]he Legislature was aware that the 2021 EIR evaluated *both* the 2021 [long range development plan] and [the student housing project], and that both were at issue in [*Make UC I*]," yet there was no indication in the legislative history the Legislature intended Public Resources Code section 21085 to apply solely to

19

the housing project.  (*Make UC II*, at pp. 61–62.)  The court also reasoned that, as a matter of public policy, "we find it untenable that the Legislature would preclude the consideration of social noise impacts under CEQA only for projects designed to add residential units to a specific location (such as [the student housing project]) while potentially requiring the same analysis of social noise when an agency makes broader land use planning decisions (such as the [2021 long range development plan]) that encompass the specific projects."  (*Id.* at p. 63.)

### 2.     Analysis

We based our original opinion on the zoning administrator's concern that noise and music from rooftop decks would overwhelm neighboring properties, which as discussed below, is akin to the "crowds of people talking, laughing, shouting, and playing music that disturbs neighboring residents" at issue in *Make UC I*.  (*Supra*, 88 Cal.App.5th at p. 685.)  Under Assembly Bill No. 1307 and *Make UC II*, such noise, i.e., "noise generated by project occupants and their guests," is not a significant environmental effect for purposes of CEQA.  The zoning administrator's noise concerns therefore do not preclude application of a Class 32 CEQA exemption.

Appellants attempt to distinguish *Make UC II* on the basis that that decision concerned "social noise," defined as "noise generated by human voices during social interactions" (*Make UC II*, *supra*, 16 Cal.5th at p. 49 & fn. 2), whereas the instant case "involves rooftop decks that could have amplified music." Appellants further contend Assembly Bill No. 1307 "addresses only unamplified 'social noise' caused by human voices, not amplified sounds."  We reject this argument for several reasons.

First, the Supreme Court, in defining "social noise," was not interpreting the meaning of the word "noise" as used in Public Resources Code section 21085, but rather interpreting how the project opponents in that case were using that term. (See *Make UC II*, *supra*, 16 Cal.5th at p. 49, fn. 2.) The court gave no indication it was limiting Public Resources Code section 21085 to the project opponents' definition of "social noise."

Second, when concluding the Legislature intended Assembly Bill No. 1307 to abrogate *Make UC I*, the Supreme Court in *Make UC II* quoted *Make UC I*'s holding that CEQA applied to " 'crowds of people talking, laughing, shouting, and *playing music* that disturbs neighboring residents.' " (*Make UC II*, *supra*, 16 Cal.5th at p. 60, quoting *Make UC I*, *supra*, 88 Cal.App.5th at p. 685, italics added).[8] Thus, the Supreme Court recognized that the holding the Legislature intended Assembly Bill No. 1307 to abrogate includes music as well as voices.

---

[8] The full quotation is: "[I]t is quite clear that, in enacting section 21085, the Legislature was focused on rejecting the [*Make UC I*] court's central underlying conclusion that social noise from residential users may constitute a significant effect on the environment. (Compare *Make UC* [*I*], *supra*, 88 Cal.App.5th at p. 685, 304 Cal.Rptr.3d 834 ['CEQA applies to the type of noise at issue here—crowds of people talking, laughing, shouting, and playing music that disturbs neighboring residents'] with Sen. Com. on Environmental Quality, Analysis of Assem. Bill No. 1307, *supra*, p. 1 [broadly stating that the bill 'specifies that noise from residents does not constitute a significant environmental effect under the California Environmental Quality Act'].)" (*Make UC II*, *supra*, 16 Cal.5th at p. 60.)

Third, the legislative history of Assembly Bill No. 1307 indicates the Legislature considered limiting Public Resources Code section 21085 to unamplified human voices, but ultimately rejected that approach. As originally proposed, Public Resources Code section 21085 read, "For purposes of this division, noise generated by the unamplified voices of residents is not a significant effect on the environment for residential projects." (Assem. Bill No. 1307 (2023–2024 Reg. Sess.), as amended Mar. 16, 2023.) That limitation does not appear in the enacted version of Public Resources Code section 21085, which applies more broadly to "noise generated by project occupants and their guests." " 'The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision.' [Citation.]" (*People v. Soto* (2011) 51 Cal.4th 229, 245.[9]

Finally, limiting Public Resources Code section 21085 solely to the noise of unamplified human voices would undercut one of the purposes of Assembly Bill No. 1307, which is "to 'remove the potential for litigants to challenge residential development based on the speculation that the new residents will create unwanted noises.' " (*Make UC II*, *supra*, 16 Cal.5th at

---

[9] We acknowledge some of the legislative reports analyzing the proposed Assembly Bill No. 1307 stated an intent that "minor and intermittent noise nuisances, such as from unamplified human voices, be addressed through local nuisance ordinances and not via CEQA." (See, e.g., Sen. Com. on Environmental Quality, Analysis of Assem. Bill No. 1307, p. 3.) Again, however, the Legislature did not enact the original bill language limiting its reach to unamplified human voices, instead broadening it to all noise generated by project occupants and their guests.

p. 60, quoting Sen. Com. on Environmental Quality, Analysis of Assem. Bill No. 1307, p. 3.) Residents inevitably make noises beyond merely speaking, including walking about, cooking and cleaning, exercising, watching television, and listening to music. If those noises remained an "environmental effect" for purposes of CEQA, Assembly Bill No. 1307 would do nothing to stem future litigation, because project opponents could always claim the influx of new residents would create noise impacts aside from their voices. The Legislature could not have intended this result.

Appellants cite *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, which stated, "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Id.* at p. 390.) Appellants argue this principle compels us to interpret Public Resources Code section 21085 narrowly to apply solely to unamplified noises. We conclude limiting Public Resources Code section 21085 to unamplified human voices is not " 'within the reasonable scope of the statutory language,' " when the Legislature expressly rejected that limitation during the drafting process, and the limitation would undercut the purpose of Assembly Bill No. 1307.

Appellants note our original opinion relied not only on *Make UC I*, but also *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, a case holding that an EIR was required to assess noise impacts from crowds and music at a wedding venue. (*Id.* at pp. 732–734.) Because Assembly Bill No. 1307 distinguishes residential from nonresidential noise impacts for purposes of CEQA, *Keep Our Mountains Quiet*, which

23

concerned a nonresidential project, is not instructive on the interpretation of Public Resources Code section 21085.

Appellants argue *Make UC II* is distinguishable because it "involved a university's plan to provide housing for its students," whereas the instant case "involves a private proponent's project near a university, wherein the university itself opposed the proposal." Appellants identify nothing in the language or legislative history of Public Resources Code section 21085 indicating its application depends on the purpose of a particular residential project or the identities of the parties supporting or opposing it.

For similar reasons, we disagree with appellants that this case is distinguishable because the noise concern arose from a particular feature of the project's design—the rooftop decks—as opposed to the general concern of occupant noise in *Make UC I* and *II*. Again, appellants identify nothing in the language or legislative history of Public Resources Code section 21085 indicating its application depends on where the occupants are located within a residential project when they generate noise. The Legislature did not, for example, provide that outside noise should be treated differently than inside noise.

Appellants argue Assembly Bill No. 1307 does not address CEQA exemptions, but instead addresses only the analysis required "in EIRs, negative declarations, and [mitigated negative declarations]." "A negative declaration is a written statement that briefly explains why a project will not have a significant environmental impact and therefore will not require an EIR." (*Mejia v. City of Los Angeles* (2005) 130 Cal.App.4th 322, 330.) "A mitigated negative declaration is proper . . . if project revisions

24

would avoid or mitigate the potentially significant effects identified in an initial study . . . ." (*Id.* at p. 331.)

In making this argument, we presume appellants are referring to the Legislative Counsel's digest included in Assembly Bill No. 1307, which provides a short description of CEQA proceedings, including that agencies prepare EIRs or, alternatively, negative declarations or mitigated negative declarations, with no reference to CEQA exemptions.[10]

We reject appellants' interpretation of the Legislative Counsel's digest. The digest does not state the scope of the bill is limited to EIRs and negative declarations. In summarizing Public Resources Code section 21085, the digest states, "This bill would specify that the effects of noise generated by project occupants and their guests on human beings is not a significant effect on the environment for residential projects for purposes of CEQA," without limiting that description to particular proceedings within CEQA. As noted, Public Resources Code

---

[10] The paragraph of the digest to which appellants apparently refer states, "The California Environmental Quality Act (CEQA) requires a lead agency, as defined, to prepare, or cause to be prepared, and certify the completion of an environmental impact report (EIR) on a project that it proposes to carry out or approve that may have a significant effect on the environment or to adopt a negative declaration if it finds that the project will not have that effect. CEQA also requires a lead agency to prepare a mitigated negative declaration for a project that may have a significant effect on the environment if revisions in the project would avoid or mitigate that effect and there is no substantial evidence that the project, as revised, would have a significant effect on the environment." (Assem. Bill No. 1307 (2023–2024 Reg. Sess.) Legislative Counsel's Digest.)

25

section 21085 itself states it pertains to "this division," referring to division 13 of the Public Resources Code, i.e., CEQA, without limitation to any particular part of CEQA. We therefore do not infer from the digest's lack of reference to CEQA exemptions that the Legislature did not intend Assembly Bill No. 1307 to apply to CEQA exemptions.

Appellants note Assembly Bill No. 1307 did not change the Class 32 exemption itself, which still requires that the project "not result in any significant effects relating to . . . noise." (§ 15332, subd. (d).) This is so, but what the bill does establish is that the effect of noise generated by occupants and guests of residential projects on human beings is not a "significant effect." Section 15332's concern with noise would appear to remain salient in other circumstances, such as in nonresidential projects, or residential projects in which there are significant noise effects apart from the effects of noise generated by occupants and their guests on human beings.

Appellants argue we should apply Assembly Bill No. 1307 only prospectively, given the presumption against retroactive application of legislation. (See *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 475.) Appellants do not address the Supreme Court's statement in *Make UC II* that "[i]n mandamus proceedings, a reviewing court applies the law that is current at the time of judgment in the reviewing court." (*Supra*, 16 Cal.5th at p. 55.) The Supreme Court applied that principle to reject the *Make UC* project opponents' CEQA challenge, although the EIR at issue predated Assembly Bill No. 1307. Other courts have done similarly in analogous circumstances. (See, e.g., *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 626 (*Citizens for Positive Growth*)

26

[rejecting a traffic challenge to 2015 EIR after 2018 statutory and regulatory amendments declared certain traffic impacts do not constitute significant impacts on the environment for purposes of CEQA].)  In line with these authorities, we apply current law, under which appellants' noise challenge necessarily fails.

Appellants argue to the extent Assembly Bill No. 1307 applies retroactively, it should do so only as to the *Make UC I* decision, which the Supreme Court identified as the target of Assembly Bill No. 1307.  Appellants contend, "[T]here is no similar expression of legislative intent to apply" that bill to our original opinion, and therefore the Legislature "did not include [our prior opinion] within the scope of AB 1307."  Whether or not the Legislature had our original opinion in mind when it enacted Assembly Bill No. 1307, that bill has established as a matter of current law that the effects of noise generated by occupants of residential projects and their guests on human beings are not significant environmental effects for purposes of CEQA. *Make UC II* compels us to apply that current law in this mandamus proceeding.

Appellants note our original opinion declined to reach their argument concerning the "unusual circumstances" exception to the CEQA exemption (§ 15300.2, subd. (c)), and ask that we consider it now.  That exception precludes application of a CEQA exemption if "there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."  (*Ibid.*)  Appellants argued in their original briefing that the project's rooftop decks are an unusual circumstance that "may result in adverse noise impacts."

Assuming arguendo the rooftop decks are an unusual circumstance, the exception nonetheless would not apply because

the only environmental impact appellants identify is neighbors being bothered by noise from people congregating and listening to music on the decks.  Under Public Resources Code section 21085, that noise cannot constitute "a significant effect on the environment," and thus the requirements of the "unusual circumstances" exception are not met.

**E.  Current Law Requires The City To Find the Project Is Consistent With the Applicable Redevelopment Plan Before Granting a Class 32 CEQA Exemption**

Appellants contend substantial evidence does not support the City's application of the Class 32 exemption because the City never determined whether the project was consistent with the redevelopment plan applicable to the project site.  They further argue that the project is inconsistent with the redevelopment plan's density limitations.

In our original opinion, we declined to reach these arguments given our holding that appellants prevailed on the alternative basis of noise impacts.  We observed the parties' briefing had not sufficiently addressed questions we deemed pertinent to the question of redevelopment plan consistency, including the relationship of the state density bonus law and the redevelopment plan, and the retroactivity of LAMC section 11.5.14, which effectively incorporated the redevelopment plan into the code chapter containing the City's zoning ordinance, but which was not yet in effect when the City granted the CEQA exemption in this case.  We stated, "We leave these questions for another day, should they arise, to enable the parties to brief these issues." (*West Adams Heritage Association v. City of Los Angeles*, *supra*, B319121.)

28

Having concluded herein that our original holding concerning noise is no longer valid, we address appellants' arguments concerning redevelopment plan consistency. As set forth below, we agree with appellants that before granting the Class 32 exemption, the City must determine whether the project is consistent with the redevelopment plan. The grant of the exemption must be set aside until the City does so.

On the particular issue of density, however, we hold state law requires the City to calculate the project's allowable density based on the generally applicable zoning ordinance rather than the redevelopment plan, because the former allows greater density than the latter. The City's deviation from the redevelopment plan's density limitations therefore is correct under state law, and does not preclude application of the Class 32 exemption.

### 1. The question of redevelopment plan consistency properly is before us

As an initial matter, respondents have moved to strike appellants' arguments concerning redevelopment plan consistency as violating the California Rules of Court concerning transfers from the Supreme Court. We conclude the issue of redevelopment plan consistency is properly before us after the Supreme Court's transfer.

California Rules of Court,[11] rule 8.200(b)(1) provides, "Within 15 days after finality of a Supreme Court decision remanding or order transferring a cause to a Court of Appeal for further proceedings, any party may serve and file a supplemental

---

[11] Unspecified rule citations are to the California Rules of Court.

29

opening brief in the Court of Appeal.  Within 15 days after such a brief is filed, any opposing party may serve and file a supplemental responding brief."  Rule 8.200(b)(2) provides, "Supplemental briefs must be limited to matters arising after the previous Court of Appeal decision in the cause, unless the presiding justice permits briefing on other matters."

In this case, respondents filed the first supplemental brief exactly 15 days after the transfer from the Supreme Court.  That supplemental brief addressed our previous holding concerning noise but no other issues.  Appellants then filed their own supplemental brief addressing the noise issue as well as additional issues, including redevelopment plan consistency.  Respondents moved to strike appellants' supplemental brief.  We invited respondents to file an additional brief responding to appellants' supplemental brief, which they did.

In their motion to strike, respondents argue appellants, as the party bearing the burden on appeal to show error, should have filed the first supplemental brief, and by not doing so "sandbag[ged] Respondents with all new arguments with no opportunity to respond."  Respondents further argue under rule 8.200(b)(2), the only matter properly before this court following transfer is the noise issue, and appellants may not "reargu[e] old issues in a supplemental brief."

Addressing respondents' second argument first, we disagree the Supreme Court's transfer order limits us to the noise issue.  Rule 8.200(b)(2) limits the parties' briefing to "matters arising after the previous Court of Appeal decision."  Our previous decision expressly noted our noise holding made it unnecessary to address the redevelopment plan consistency issues, and we therefore would leave those latter issues "for

30

another day, should they arise." That day has now arrived, as a result of new authorities invalidating our previous noise holding. The necessity of addressing the redevelopment plan consistency issue thus is a "matter[ ] arising after the previous Court of Appeal decision." (Rule 8.200(b)(2).)

Given that our original opinion expressly and conspicuously deferred the redevelopment plan consistency question "for another day," it is disingenuous for respondents to claim they were "sandbag[ged]" when appellants addressed that question in their supplemental brief. Respondents could have, and should have, addressed that issue in their first supplemental brief.[12] Although they contend appellants should have filed their brief first, rule 8.200 has no such requirement, instead stating that "any party may serve and file a supplemental opening brief," after which "any opposing party" may file a responding brief. (Rule 8.200(b)(1).) Respondents' characterization of appellants' supplemental brief as a "reply" brief improperly raising new arguments is not consistent with the Rules of Court.

In any event, at our invitation, respondents have now filed an additional brief, and thus have had full opportunity to address the arguments appellants raise in their supplemental brief. This ameliorates any prejudice respondents claim they have suffered

---

[12] Appellants argue respondents forfeited their redevelopment plan consistency arguments by failing to raise them in their initial supplemental brief. The court benefits from all parties' perspectives on these complex issues, and therefore allowed respondents additional briefing.

31

from the order in which the briefs were filed.  We now turn to the merits of the parties' arguments.[13]

## 2. Additional legal and procedural background

### a. *The redevelopment plan*

"In the aftermath of World War II, the Legislature authorized the formation of community redevelopment agencies in order to remediate urban decay." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 245.)  These agencies typically were "governed by the sponsoring community's own legislative body." (*Id.* at p. 246.)  Agencies were "authorized to 'prepare and carry out plans for the improvement, rehabilitation, and redevelopment of blighted areas.' [Citation.]" (*Ibid.*)  " 'As the fundamental document governing a redevelopment agency's activities, a redevelopment plan basically acts as the agency's charter.  Adopted by the local legislative body (a city council or county board of supervisors), the plan establishes long-term planning goals as well as implementation policies and procedures for the redevelopment of a designated project area. . . .' [Citation.]" (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 529.)

The redevelopment plan at issue in the instant case originally was entitled the "Redevelopment Plan for the Hoover Redevelopment Project," but the City refers to it today as the

---

[13] Respondents' motion to strike also seeks to strike appellants' mootness argument, an argument we have resolved on the merits in respondents' favor.  (See Discussion, part C, *ante*.)  Respondents' motion to strike is denied.

Exposition/University Park Redevelopment Plan.  (See <https://planning.lacity.gov/plans-policies/overlays/expositionuniversity-park> [as of Oct. 30, 2024].) The Los Angeles City Council adopted the plan by ordinance in 1966.  (Los Angeles Ordinance No. 131730.)  The most recent version is the fifth amended version, adopted by the city council in 1989.  (Los Angeles Ordinance No. 164850; Redevelopment Plan for the Expanded Project Area of the Hoover Redevelopment Project as Amended by the Fifth Amendment to the Redevelopment Plan for the Hoover Redevelopment Project, adopted May 9, 1989 (Hoover Redevelopment Plan).)

Section XIII of the redevelopment plan is entitled "Land Uses Permitted in Project Area" (underscoring & some capitalization omitted), and includes, inter alia, density limits and provisions for a density bonus.  (Hoover Redevelopment Plan, *supra*, §§ 1302–1306.)

The Legislature dissolved all redevelopment agencies effective February 1, 2012.  (See *City of Galt v. Cohen* (2017) 12 Cal.App.5th 367, 374.)  The Legislature provided that "all land use related plans and functions of the former redevelopment agency" could be "transferred to the city, county, or city and county that authorized the creation of a redevelopment agency" should the locality so request.  (Health & Saf. Code, § 34173, subd. (i).)  The South Los Angeles Community Plan, a component of the City's general plan land use element, states, "[T]he land use authorities granted in the Redevelopment Project Area Plans," including the Exposition/University Park redevelopment plan, "remain effective and will continue to be administered by the Department of City Planning."  (South Los Angeles Community Plan, Nov. 2017, at p. 1–13; see *id.* at p. 3–29.)

33

Effective November 11, 2019, the city council passed Ordinance No. 186325 "to effectuate the transfer of land use related plans and functions of the former local Community Redevelopment Agency (CRA) to the City of Los Angeles." (Los Angeles Ordinance No. 186325, at p. 1.)  The ordinance, inter alia, added section 11.5.14 to Chapter 1 of the Los Angeles Municipal Code, the chapter governing zoning.  (Los Angeles Ordinance No. 186325, at p. 2.)  The objective of LAMC section 11.5.14 is "to establish uniform citywide procedures, standards, and criteria for reviewing and processing Redevelopment Plan Projects," including "Administrative Review" and "Project Compliance."  (LAMC, § 11.5.14, subd. (A).)  The section requires the City's planning department to review project applications "for compliance with the relevant standards of [the LAMC] and the appropriate Redevelopment Plan."  (*Id.*, subd. (D)(4)(e).)

LAMC section 11.5.14, subdivision (B)(1) provides, "Whenever the Redevelopment Regulations conflict with provisions contained in Chapter 1 of this Code or any other relevant City ordinances, *the Redevelopment Regulations shall supersede those provisions*, unless the applicable Redevelopment Regulations specifically provide otherwise or are amended." (Italics added.)  "Redevelopment Regulations" are defined as "all the land use provisions of the Redevelopment Plans and design for development guidelines adopted pursuant to such Redevelopment Plans that govern land use or development . . . ." (LAMC, § 11.5.14, subd. (C), boldface omitted.)

### *b.* *Redevelopment plan proceedings in this case*

The zoning administrator's May 17, 2019 determination letter finding the project eligible for a Class 32 exemption did not

34

include a redevelopment plan consistency analysis, although the zoning administrator determined the project was consistent with other land use provisions, specifically the South Los Angeles Community Plan and the North University Park-Exposition Park-West Adams Neighborhood Stabilization Overlay District. The only mention of the redevelopment plan in the determination letter was in a summary of public comments from project objector, Jim Childs, in which Childs commented that the project's density should be set according to the redevelopment plan. The letter contains no response to Childs's comment.

The notice of exemption dated September 12, 2019 granting the Class 32 exemption similarly discussed the findings concerning the community plan and overlay district, but did not mention the redevelopment plan.

In response to the administrative appeals filed by Childs and the project applicants, the City's Department of City Planning prepared an appeal recommendation report. The report noted that one of Childs's contentions in the appeal was that the project did not conform to the redevelopment plan. The report acknowledged, "[T]he project site is subject to the Exposition/University Park Redevelopment Plan," but concluded that "under the State and City Density Bonus provisions, projects that request and qualify for a Density Bonus base the bonus on the zoning code or general plan density, not on a redevelopment plan."

The planning commission denied Childs's administrative appeal on October 10, 2019. The commission then issued a corrected letter of determination on December 11, 2019 imposing conditions of approval on the project, including, "Prior to the issuance of a building permit, the Applicant shall obtain approval

35

from . . . the Department of City Planning, as the successor to the Community Redevelopment Agency, as approved by Ordinance 186,325." Again, that ordinance enacted LAMC section 11.5.14, which requires the planning department to determine whether a project complies with the relevant redevelopment plan. (*Id.*, subd. (D)(4)(e).)

After receiving public comment, the city council's planning and land use management committee recommended the council adopt the planning commission's findings and deny Childs's appeal. The committee's report did not mention the redevelopment plan. The city council adopted the committee's report and denied the appeal.

### 3. Current city law requires redevelopment plan consistency before granting a Class 32 CEQA exemption

To receive a Class 32 CEQA exemption, a project must be "consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations." (§ 15332, subd. (a).) Appellants contend this requires the City to find the project consistent with the redevelopment plan before granting a Class 32 exemption. We agree.[14]

---

[14] We note that the only inconsistency between the project and the redevelopment plan appellants identify on appeal is that the City's calculation of the project's allowable density and density bonus resulted in more units than would otherwise be permitted under the redevelopment plan. We address that contention in Discussion, part E(5), *post*.

With the enactment in 2019 of LAMC section 11.5.14, subdivision (B)(2), the city council effectively has incorporated the land use requirements of the redevelopment plan into the city zoning ordinance. To recap, that section provides "Redevelopment Regulations," which include "all the land use provisions of the Redevelopment Plans," "supersede" any conflicting provisions of the zoning ordinance "or any other relevant City ordinances." (LAMC, § 11.5.14, subds. (B)(2), (C).)

Thus, when the City determines if a project is "consistent . . . with applicable zoning designation and regulations" for purposes of a Class 32 exemption (§ 15332, subd. (a)), the City must evaluate the project not only under the general zoning provisions relevant to the project area, but under the applicable redevelopment plan as well, to ensure the general zoning provisions do not conflict with the redevelopment plan as applied to the particular project.

We recognize LAMC section 11.5.14, effective November 11, 2019, was not in effect when the City's planning department granted the Class 32 exemption or when the planning commission denied Childs's administrative appeal. It was in effect, however, when the planning commission issued its corrected letter of determination, which referenced the ordinance enacting LAMC section 11.5.14, and when the city council denied Childs's administrative appeal. Also, in this mandamus proceeding we "appl[y] the law that is current at the time of judgment in the reviewing court." (*Make UC II*, *supra*, 16 Cal.5th at p. 55.) One purpose of this rule "is to prevent the appellate courts from issuing orders for the construction of improvements contrary to presently existing legislative provisions." (*Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1257, fn. 12

37

(*Fairbank*).) We therefore conclude current law requires the City to find the project is consistent with the redevelopment plan before granting the Class 32 exemption.

Respondents cite authority that courts may not apply a law retroactively unless " 'it contains express language of retroactivity *or* if other sources provide a clear and unavoidable implication that [the legislative body] intended retroactive application." (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 844; see *City of Monte Sereno v. Padgett* (2007) 149 Cal.App.4th 1530, 1539 [new laws apply retroactively only when they "have no effect on substantive rights or liabilities, but which affect only modes of procedure to be followed in future proceedings"].) None of these cases involved writs of mandamus, the context in which *Make UC II* declared courts should apply current law. Further, *Make UC II* did not indicate its rule depended on legislative intent of retroactivity.

Respondents argue the rule applying current law in mandamus proceedings "is appropriate only if there are no vested rights or administrative finality involved." (See *Fairbank*, *supra*, 75 Cal.App.4th at p. 1257, fn. 12 ["at least where no vested rights will be impaired, it is appropriate for an appellate court to apply the law in existence at the time of its decision rather than at the time an approval was issued"].) They contend, "[T]he Project approvals were final and not subject to appeal."

"The doctrine of vested rights is ordinarily applied when a local agency attempts to prevent the completion or use of a project on the grounds that the project, while lawful at the time a permit was issued, had been rendered unlawful by an intervening change in the law." (*Attard v. Board of Supervisors of Contra Costa County* (2017) 14 Cal.App.5th 1066, 1076.) "In California,

the developer's right to complete a project as proposed does not vest until a valid building permit, or its functional equivalent, has been issued and the developer has performed substantial work and incurred substantial liabilities in good faith reliance on the permit." (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 321; see *South Lake Tahoe Property Owners Group v. City of South Lake Tahoe* (2023) 92 Cal.App.5th 735, 747 ["The requisite permit on which a vested right may be based is a valid building permit or its functional equivalent"].) California courts apply the requirement of a building permit or functional equivalent "most strictly," "regardless of the property owner's detrimental reliance on local government actions and regardless of how many other land use and other preliminary approvals have been granted." (*Toigo*, at p. 322.)

Respondents do not contend the City has issued a building permit or its functional equivalent for this project. To the contrary, in their briefing they concede the planning commission conditioned issuance of a building permit on a future redevelopment plan consistency analysis. Absent a building permit or its functional equivalent, respondents cannot invoke the doctrine of vested rights.

Respondents rely on *Russian Hill Improvement Assn. v. Board of Permit Appeals* (1967) 66 Cal.2d 34 for their contention that "administrative finality" precludes application of current law to the approvals in this case. *Russian Hill* involved a provision of San Francisco's city planning code providing that once the city issued a lawful permit, the project could be completed in accordance with the approved plans even if there were a subsequent change to the zoning laws. (*Id.* at pp. 36 & fn. 1, 39.) The effect of this provision was to modify the common law vested

39

rights doctrine to no longer require that developers perform substantial work in reliance on the permit to obtain immunity from revocation of the permit based on changes in the law. (See *id.* at p. 39.) In that particular case, the Court of Appeal concluded the developer could not rely on the provision because the permit application was pending before the Board of Permit Appeals, and therefore had yet to be granted. (*Id.* at p. 36.)

*Russian Hill* does not help respondents for two reasons. First, the developer in that case relied on a San Francisco law modifying the vested rights doctrine, but respondents identify no equivalent provision in the Los Angeles Municipal Code. We decline to scour that code for pertinent authority on respondents' behalf.

Second, although modifying the vested rights doctrine, the San Francisco law required a lawfully issued building permit, which, as discussed above, has not been issued in this case. Notably, the developer in *Russian Hill* was *denied* immunity from changes in the law because the developer's application was pending administrative appeal. Similarly, here the city council enacted LAMC section 11.5.14 while an administrative appeal was pending before the council, and therefore that municipal code provision was in effect before there was "administrative finality."

Respondents cite authority for the purported proposition that "CEQA employs a strong policy in favor of certainty and finality that militates against any requirement that the City Council would be obligated to apply [Los Angeles Ordinance No. 186325]—and restart the entire Project entitlement CEQA review processes—at that late date."

As an initial matter, we do not hold or suggest the City must "restart the entire Project entitlement CEQA review

40

processes." We merely hold the City must assess whether the project complies with the redevelopment plan to the extent the plan conflicts with relevant provisions of the municipal code.[15] Our holding leaves untouched the City's other findings regarding the Class 32 exemption.

Respondents' authorities are also inapposite. *Long Beach Sav. & Loan Assn. v. Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249 noted the CEQA Guidelines had been extensively revised since "the original adoption of the redevelopment project" at issue in that case. (*Id.* at p. 261, fn. 12.) The Court of Appeal concluded that "[f]airness and the need for finality" dictated that the agency's environmental review process should "be measured against those regulations in effect as of . . . the date when respondents presented the negative declaration for public review." (*Ibid.*) The court observed that the drafters of the CEQA Guidelines had "recognized" "this rule of reason" through section 15007, although the relevant provisions were not in effect at the time of the approvals in that case. (*Long Beach Sav. & Loan Assn.*, at p. 261, fn. 12.) Those relevant provisions provide that "[a]mendments to the guidelines apply prospectively only," and "[i]f a document meets the content

_____

**15** As we address in Discussion, part E(5), *post*, under the particular circumstances of this case, state law dictates that the project's maximum allowable density and density bonus are determined according to the City's generally applicable zoning ordinance rather than the redevelopment plan. Inconsistency between the project's density and the redevelopment plan therefore does not preclude application of the Class 32 exemption. We have no occasion to address whether state law otherwise affects analysis of the project's consistency with the redevelopment plan, and we express no opinion on that question.

41

requirements in effect when the document is set out for public review, the document shall not need to be revised to conform to any new content requirements in guideline amendments taking effect before the document is finally approved. (§ 15007, subds. (b), (c).)

*Citizens for Positive Growth*, *supra*, 43 Cal.App.5th 609, similarly acknowledged that under section 15007, an agency did not have to comply with CEQA Guidelines regarding traffic impacts enacted after completion of the EIR. (*Id.* at pp. 625–626.)

These cases do not assist respondents, because the case before us does not involve a change to the CEQA Guidelines, but a change to the Los Angeles Municipal Code affecting land use requirements for the project area. Simply put, section 15007's rule of prospective application is inapplicable.

Respondents' argument is also inconsistent with the Supreme Court's retroactive application in *Make UC II* of statutory changes to CEQA's treatment of noise for residential projects. Given that authority, respondents cannot credibly argue that courts do not apply current law in mandamus proceedings concerning CEQA. Respondents in fact rely on that rule to invoke Assembly Bill No. 1307 in their favor on the noise issue. It would be anomalous for us to hold that a developer may benefit retroactively from a change in the law affecting a CEQA determination, but a project opponent may not.

In arguing against applying current law to the redevelopment plan consistency issue, respondents also cite *San Mateo Gardens*, *supra*, 1 Cal.5th 937. That case addressed whether "CEQA's subsequent review provision, [Public Resources Code] section 21166, applies only to projects for which an initial

EIR was prepared," but not projects for which a negative declaration was prepared.[16] (*San Mateo Gardens*, at pp. 953–954.) In that case, a community college district in 2011 proposed changes to a facilities improvement plan the district approved in 2006 through a mitigated negative declaration. (*Id.* at p. 946.) Objectors challenged the plan change, contending, inter alia, that the district could not rely on Public Resources Code section 21166 to avoid preparing an EIR because the district had never prepared an initial EIR. (*San Mateo Gardens*, at pp. 953–954.)

The Supreme Court held Public Resources Code section 21166 applied equally when the agency had prepared a negative declaration as opposed to an EIR. The court stated, "Limiting agencies' postapproval review obligations for projects that were initially approved via negative declaration is wholly consistent with a statutory scheme in which negative declarations, no less than EIRs, are entitled to a presumption of finality once adopted." (*San Mateo Gardens*, *supra*, 1 Cal.5th at p. 956.) The Supreme Court explained, " 'In a case in which an initial EIR has

---

[16] Public Resources Code section 21166 provides, "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

been certified, [Public Resources Code] section 21166 comes into play precisely because in-depth review of the project has already occurred, the time for challenging the sufficiency of the original CEQA document has long since expired, and the question before the agency is whether circumstances have changed enough to justify repeating a substantial portion of the process.  [Citations.] These same principles apply with even greater force in a case such as this,' in which the project 'initially raised so few environmental questions that an EIR was *not* required, but a negative declaration was found to satisfy the environmental review requirements of CEQA.' . . . . [Citation.]"  (*San Mateo Gardens*, at p. 956.)  The Supreme Court observed, "The alternative that plaintiff proposes—which would restart the CEQA process every time plans or circumstances change, or whenever new information comes to light—'would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.' [Citations.]"  (*Ibid.*)

Unlike in *San Mateo Gardens*, the instant case does not involve a situation " 'in which an initial EIR [or negative declaration] has been certified, . . . the time for challenging the sufficiency of the original CEQA document has long since expired, and the question before the agency is whether circumstances have changed enough to justify repeating a substantial portion of the process.' "  (*San Mateo Gardens*, *supra*, 1 Cal.5th at p. 956.) Rather, the issue in this case is whether the City complied with prerequisite CEQA obligations in granting the Class 32 exemption.  Public Resources Code section 21166, and the policy behind it, do not apply here.

44

Appellants contend the redevelopment plan provided the relevant zoning designation and regulations for the project area for purposes of the Class 32 exemption even before enactment of LAMC section 11.5.14. Because we conclude LAMC section 11.5.14 applies in this mandamus proceeding, we do not reach this contention.

4. **The City cannot rely on a future redevelopment plan consistency analysis to justify its prior approval of the Class 32 exemption**

As set forth in Discussion, part E(2)(b), *ante*, the City has yet to determine whether the project is consistent with the redevelopment plan. Respondents argue, however, the City adequately addressed any need for redevelopment plan consistency by imposing the condition that prior to issuance of a building permit, the project applicant seek approval from the community redevelopment agency or the City as the agency's successor. Respondents contend, "This condition assured that the Project's consistency with the Redevelopment Plan would be formally determined, providing the requisite substantial evidence" in support of the CEQA exemption. "If, for some reason, [the applicant] were unable to obtain the required Redevelopment Plan consistency determination, then the City would not issue building permits for the Project until and unless consistency could be established." In other words, although respondents concede the City had yet to determine redevelopment plan consistency when it granted the Class 32 exemption, respondents claim the City has ensured such a determination will be made or the project will not proceed.

We reiterate that under the applicable standard of review, we may uphold the City's exemption determination only if it is

45

supported by substantial evidence.  A determination that has yet to be made cannot provide substantial evidence of anything, CEQA exemption or otherwise. Respondents cite no authority allowing us to rely on future events to supply prerequisite findings.

Respondents maintain the City's practice of deferring redevelopment consistency determinations is "longstanding," and particularly warranted in this case because at the time of the relevant approvals, the City was transitioning authority over redevelopment plans from the Community Redevelopment Agency to the City itself.  Respondents contend, "The City's condition that Real Parties obtain a future Redevelopment Plan consistency determination . . . was a reasonable approach to dealing with this procedural transition and was consistent with . . . past practice."  Respondents further argue that "no provision of CEQA or other law prohibits the City's Redevelopment Plan approach here."

Longstanding practice or administrative convenience cannot override the fact that under LAMC section 11.5.14, the redevelopment plan's zoning provisions are now part of the City's zoning ordinance.  In the absence of a redevelopment plan consistency determination, then, there is no substantial evidence of zoning consistency, a required element of a Class 32 exemption.  Given the substantial evidence requirement, we disagree that CEQA allows the City's deferred approach.

Respondents cite case law and provisions of CEQA to argue that CEQA does not require agencies to conduct all regulatory review simultaneously with CEQA review, and CEQA encourages environmental analysis early in the approval process, which therefore of necessity may take place before other regulatory

46

approvals.  Application of a Class 32 CEQA exemption requires an agency to make specified findings.  The fact that those findings arguably might also be relevant to a non-CEQA approval does not obviate the need for the agency to make those findings before applying the exemption.

Respondents argue, "[F]ormal findings are not required for categorical exemption determinations."  They cite *Muzzy Ranch Co.*, *supra*, 41 Cal.4th 372, which stated that the grant of a CEQA exemption "need not necessarily be preceded by detailed or extensive factfinding," but rather "[e]vidence appropriate to the CEQA stage in issue is all that is required."  (*Id.* at p. 388.)  Respondents also cite *World Business Academy v. State Lands Com.* (2018) 24 Cal.App.5th 476, which stated, " 'The findings of an administrative agency can be informal so long as they serve the purposes of enabling the parties to determine whether and on what basis to appeal and enabling a reviewing court to determine the basis for the decision.  [Citation.] . . . . [Citation.]' [Citation.]" (*Id.* at p. 496.)  Further, " '[A]n agency's finding that a particular proposed project comes within one of the exempt classes necessarily includes an implied finding that the project has no significant effect on the environment.' [Citation.]" (*Ibid.*)

The fact that findings in support of a CEQA exemption need not be formal or detailed does not negate the requirement that findings must be made in the first place.  Here, the record reflects, and respondents concede, the City has not made *any* findings regarding redevelopment plan consistency, apart from concluding the redevelopment plan does not apply when calculating allowable density.  They therefore have failed to find that the project is consistent with the applicable zoning for the area, as required for the Class 32 exemption.

### 5. The Redevelopment Plan's Density Provisions Do Not Apply to the Project

Appellants argue the project already is inconsistent with the redevelopment plan because the City calculated the project's allowable density based on the City's generally applicable zoning ordinance as opposed to the redevelopment plan.

As we explain below, we conclude under the circumstances of this case, the state density bonus law requires the City to determine the project's maximum allowable density based on the general zoning ordinance rather than the redevelopment plan, despite the enactment of LAMC section 11.5.14. Thus, although as a general matter, the project must be consistent with the redevelopment plan to qualify for a Class 32 CEQA exemption (see Discussion, part E(3), *ante*), here state law mandates that, on the particular issue of density, the general zoning provision provides the density requirements for the project. The redevelopment plan's density provisions therefore do not constitute "applicable zoning designation and regulations" (§ 15332, subd. (a)) to which the project must conform to qualify for the Class 32 CEQA exemption. (See *Wollmer v. City of Berkeley* (2011) 193 Cal.App.4th 1329, 1348–1349 [when city waives zoning requirements as directed under state density bonus law, the waived requirements do not constitute "applicable zoning" for purposes of § 15332, subd. (a)].)

We further conclude the state density bonus law preempts the redevelopment plan to the extent the plan imposes conditions on density bonuses not required under state law.

48

### a. Additional legal and procedural background

#### i. The state density bonus law

The state density bonus law (Gov. Code, § 65915) "requires that cities and counties allow increased building density for development projects that dedicate" a percentage of the dwelling units to low- or very-low-income households.[17] (*Schreiber v. City of Los Angeles* (2021) 69 Cal.App.5th 549, 554–555 (*Schreiber*).) "[Government Code] section 65915 imposes a clear and unambiguous mandatory duty on municipalities to award a density bonus when a developer agrees to dedicate a certain percentage of the overall units in a development to affordable housing." (*Latinos Unidos Del Valle De Napa Y Solano v. County of Napa* (2013) 217 Cal.App.4th 1160, 1167.) "A local ordinance is preempted if it conflicts with the [state] density bonus law by increasing the requirements to obtain its benefits." (*Schreiber*, at p. 558.)

The Legislature has amended Government Code section 65915 multiple times since the City granted the density bonus in this case. In this mandamus proceeding, we apply the current version of the statute. (*Make UC II*, *supra*, 16 Cal.5th at p. 55.)

Government Code section 65915, subdivision (f), defines " 'density bonus' " as "a density increase over the otherwise maximum allowable gross residential density *as of the date of*

---

[17] In addition to housing for low- and very-low-income households, the state density bonus law awards bonuses for construction of other types of housing, including, inter alia, senior citizen housing, moderate-income housing, transitional foster youth housing, and student housing. (Gov. Code, § 65915, subds. (b)(1)(C)–(F).)

49

*application by the applicant* to the city, county, or city and county." (Italics added.) As relevant here, subdivision (o)(6) defines " 'maximum allowable residential density' or 'base density' " as "the greatest number of units allowed under the zoning ordinance, specific plan, or land use element of the general plan . . . ."[18] The density bonus is calculated as a percentage of the maximum allowable residential density. (See, e.g., Gov. Code, § 65915, subd. (f)(1), (2).) The Legislature further directs, "This chapter [i.e., the chapter governing density bonuses] shall be interpreted liberally in favor of producing the maximum number of total housing units." (Gov. Code, § 65915, subd. (r).)

The density bonus law requires cities to "adopt an ordinance that specifies how compliance with this section will be implemented," although failure to do so "shall not relieve a city . . . from complying with this section." (Gov. Code, § 65915, subd. (a)(1).)

### ii. *Municipal Code and redevelopment plan density provisions*

As noted in our Background, *ante*, the project site is zoned RD1.5-1 with a Low Medium II Residential land use designation under the South Los Angeles Community Plan, which itself is a component of the City's general plan. Under the generally applicable density provisions of the Los Angeles Municipal Code,

---

[18] For purposes of this appeal, we discern no difference between "maximum allowable gross residential density" as used in Government Code section 65915, subdivision (f) and " '[m]aximum allowable residential density' " as used in subdivision (o)(6) of that same section, and the parties do not argue otherwise.

50

RD1.5 zoning allows one dwelling unit per 1,500 square feet, or approximately 29 units per gross acre. (LAMC, § 12.09.1, subd. (B)(4).)

The redevelopment plan sets a lower maximum density than the municipal code's generally applicable density provisions, stating, "New housing developed within the areas designated Low Medium II Residential[ ] shall not exceed twenty-four (24) dwelling units per gross acre." (Hoover Redevelopment Plan, *supra*, § 1304.)

In accordance with Government Code section 65915, subdivision (a)(1), the City has enacted a density bonus ordinance, LAMC section 12.22, subdivision (A)(25), "to establish procedures for implementing State Density Bonus requirements . . . and to increase the production of affordable housing, consistent with City policies." (LAMC, § 12.22, subd. (A)(25)(a).) The ordinance defines "Density Bonus" as "a density increase over the otherwise maximum allowable residential density under the applicable zoning ordinance and/or specific plan granted pursuant to this subdivision." (*Id.*, subd. (A)(25)(b), boldface omitted.)

Section 1306 of the redevelopment plan also provides for density bonuses, stating, in relevant part, "[T]he Agency may, but is not required to, . . . authorize new housing to be developed at higher densities than otherwise permitted by [the redevelopment plan]." Section 1306 then lists criteria for agency approval of a density bonus, specifically that the bonus shall "1. Contribute to the revitalization goals of the Plan. [¶] 2. Contribute to a desirable residential environment, neighborhood stability, and not adversely impact the neighboring environment. [¶] 3. Provide units with adequate living area and avoid excessively

51

dense development. [¶] 4. Provide appropriate parking."
(Hoover Redevelopment Plan, *supra*, § 1306.)

### iii.    *Density bonus proceedings*

The project allocated six percent of its units to very-low-income-housing, which under the state and city density bonus laws entitled the project to a 22.5 percent density bonus over the otherwise maximum allowable residential density. (Gov. Code, § 65915, subd. (f)(2); LAMC, § 12.22, subd. (A)(25)(c)(1).) The parties do not dispute the City applied that bonus to a maximum allowable residential density of 29 units per gross acre, the density allowed under the generally applicable zoning ordinance, as opposed to the 24 units per acre allowed under the redevelopment plan.

As noted, when Childs objected that the density bonus was inconsistent with the redevelopment plan, the City's appeal recommendation report concluded that "under the State and City Density Bonus provisions, projects that request and qualify for a Density Bonus base the bonus on the zoning code or general plan density, not on a redevelopment plan."

### b.    *The zoning ordinance, not the redevelopment plan, sets the maximum allowable density for the project*

The question before us is whether the maximum allowable residential density to which the project's density bonus is applied is determined under the redevelopment plan or the City's generally applicable zoning ordinance. Under current City law, as discussed in Discussion, part E(3), *ante*, the redevelopment plan supersedes conflicting provisions in the zoning ordinance. (LAMC, § 11.5.14, subd. (B)(1).) The state density bonus law,

however, directs that maximum allowable residential density is calculated "as of the date of application by the applicant to the city." (Gov. Code, § 65915, subd. (f).) This provision effectively freezes in time the local law setting maximum allowable residential density as of the date the developer applies for the density bonus.[19] LAMC section 11.5.14 was enacted in November 2019 while Childs's administrative challenges to the project were pending, well after the date of project application on April 30, 2018. State law therefore requires we determine the project's maximum allowable residential density without regard to LAMC section 11.5.14.

As previously noted, appellants contend the redevelopment plan constituted the applicable zoning ordinance for the project area even before the enactment of LAMC section 11.5.14. They cite, inter alia, the fact that the City's general plan states, "[T]he land use authorities granted in the Redevelopment Project Area Plans," including the Exposition/University Park redevelopment plan, "remain effective [despite the dissolution of the redevelopment agency] and will continue to be administered by the Department of City Planning." (South Los Angeles Community Plan, Nov. 2017, at p. 1–13; see *id.* at p. 3–29.) Appellants argue the redevelopment plan therefore sets the

---

[19] We note Government Code section 65915, subdivision (f) would not prevent a locality from *increasing* the maximum allowable residential density for a project after the date of application, because the state density bonus law also provides, "If permitted by local ordinance, nothing in this section shall be construed to prohibit a city, county, or city and county from granting a density bonus greater than what is described in this section for a development that meets the requirements of this section." (*Id.*, subd. (n).)

maximum allowable residential density for the project regardless of LAMC section 11.5.14.

Respondents disagree, observing the state density bonus law determines maximum allowable residential density "under the zoning ordinance, specific plan, or land use element of the general plan" (Gov. Code, § 65915, subd. (o)(6)), without reference to redevelopment plans.  Respondents argue this indicates redevelopment plans have no bearing whatsoever on density determinations.[20]

We need not reach respondents' argument.  Assuming arguendo redevelopment plans can set the maximum allowable residential density for an area under certain circumstances, as appellants contend, we nonetheless conclude in this case, the state density bonus law requires the City to calculate the project's density using the generally applicable zoning ordinance rather than the redevelopment plan.  The Legislature has defined " '[m]aximum allowable residential density' " as, in relevant part, "the *greatest* number of units allowed under the zoning ordinance, specific plan, *or* land use element of the general plan." (Gov. Code, § 65915, subd. (o)(6), italics added.)  The disjunctive "or" indicates that when a locality has multiple land use provisions governing density that conflict with one another, the locality should look to the provision that allows the greatest number of units to be constructed.  This is consistent with the Legislature's guidance that the density bonus law "shall be

_____

**20** Appellants do not contend the redevelopment plan is a "specific plan" as that term is used in the Government Code.  (See Gov. Code, § 65450 [allowing local planning agencies to "prepare specific plans for the systematic implementation of the general plan"].)

interpreted liberally in favor of producing the maximum number of total housing units." (*Id.*, subd. (r).)

At the time of project application, which occurred before enactment of LAMC section 11.5.14, the generally applicable zoning ordinance and the redevelopment plan were separate land use provisions, the former of which allowed more density than the latter. Government Code section 65915, subdivision (o)(6) makes clear that when determining allowable density for purposes of awarding a density bonus, the City's zoning ordinance, as the land use provision allowing the greatest number of units, prevails over any competing land use provision.[21]

Appellants' interpretation, under which the redevelopment plan, even before the enactment of LAMC section 11.5.14, would supersede and effectively eliminate the general zoning provisions for the project area, would lead to fewer units being constructed than are allowed under the City's zoning ordinance. That is inconsistent with the Legislature's directive to interpret the density bonus law "liberally in favor of producing the maximum number of total housing units." (Gov. Code, § 65915, subd. (r).) We therefore decline to read "zoning ordinance," as used in the density bonus law, not to include a general zoning ordinance merely because there is a redevelopment plan that conflicts with it. Rather, we conclude the City's general zoning ordinance is one of several land use provisions the City must look to when determining which provision allows the greatest residential density. In this case, at the time the developer applied for the

---

[21] The parties do not dispute the general plan itself does not define the maximum allowable density for the area, nor do they identify a specific plan that does so.

density bonus, the zoning ordinance allowed a greater number of units than the redevelopment plan, and therefore the City correctly calculated the density bonus based on the zoning ordinance.[22]

Appellants cite *PR/JSM Rivara LLC v. Community Redevelopment Agency* (2009) 180 Cal.App.4th 1475 (*Rivara*), which held that a redevelopment agency's design guidelines setting a lower maximum allowable density than the City's zoning ordinance did not conflict with the state density bonus law. (*Id.* at pp. 1485–1486.) The Court of Appeal reached this conclusion "because the Los Angeles Municipal Code allows a redevelopment plan to adopt a base density that is lower than the 'maximum allowable residential density' under the applicable zoning ordinance." (*Ibid.*)[23]

*Rivara* is inapposite because the version of the state density bonus law applied in that case provided that " 'maximum allowable residential density' " was set "under the applicable zoning ordinance," without the language in the current version of the statute requiring localities to set density based on the

---

[22] We express no opinion whether, if a redevelopment plan allowed greater density than a zoning ordinance, the redevelopment plan would control for purposes of the state density bonus law.

[23] *Rivara* cites LAMC section 12.21.3, subdivision (F) for the proposition that redevelopment plans may set lower densities than the zoning ordinance. (*Rivara, supra*, 180 Cal.App.4th at p. 1485.) That subdivision, which was enacted in 1986, does not expressly refer to density. Rather, it states, "Additional limitations on the height and/or floor area of any building or structure may be required as set forth in each applicable Community Redevelopment Plan." (LAMC, § 12.21.3, subd. (F).)

56

"greatest" density permitted among competing land use documents. (*Rivara, supra*, 180 Cal.App.4th at p. 1485; see Gov. Code, former § 65915, subd. (g) (Stats. 2005, ch. 496, § 2).)[24] The version of Government Code section 65915 applied in *Rivara* also lacked a subdivision equivalent to subdivision (r) of the current statute directing us to interpret the state density bonus law "liberally in favor of producing the maximum number of total housing units." Given these changes in the law, we do not find *Rivara* instructive on the issue before us.

We address a final point raised in the parties' last round of supplemental briefing. The City appears to assume that, because the state density bonus law determines maximum allowable density "as of the date of application" (Gov. Code, § 65915, subd. (f)), we should apply not only the City's density limits as they existed when the developer applied for the project's density bonus, but also the version of the state density bonus law in effect at the time, that is, the 2018 version. As relevant to this case, the current version and the 2018 version differ in their definitions of "maximum allowable residential density." Under the version in effect in 2018, maximum allowable residential density was defined, in relevant part, as "the density allowed under the zoning ordinance and land use element of the general plan . . . . Where the density allowed under the zoning ordinance is inconsistent with the density allowed under the land use element of the general plan, the general plan density shall prevail." (Gov. Code, § 65915, former subd. (o)(2), Stats. 2016, ch.

---

[24] Based on the quoted statutory language and citation in *Rivara*, it appears the court in that case did not apply the then-current version of Government section 65915 (Stats. 2008, ch. 454, § 1), but rather the version in effect the year prior.

761, § 1.7.)  In other words, the 2018 version did not direct cities to apply the greatest density permitted under competing land use provisions, instead directing only that the general plan would prevail over the zoning ordinance to the extent they conflicted.

We disagree with the City's assumption that the 2018 version of the state density bonus law applies to this case. Although we have concluded Government Code section 65915, subdivision (f) freezes in time the local law setting maximum allowable residential density as of the date the developer applies for the density bonus, we do not read that subdivision as also freezing in time the applicable state density bonus law such that we would not apply the current definition of maximum allowable residential density under the statute.

To reiterate, Government Code section 65915, subdivision (f) provides, " '[D]ensity bonus' means a density increase over the otherwise maximum allowable gross residential density as of the date of application . . . ."  Subdivision (o)(6) then supplies the definition of " '[m]aximum allowable residential density' " as "the greatest number of units allowed under the zoning ordinance, specific plan, or land use element of the general plan . . . ."

When the definition from Government Code section 65915, subdivision (o)(6) is substituted for "maximum allowable gross residential density" in subdivision (f), subdivision (f) reads as follows:  " '[D]ensity bonus' means a density increase over the otherwise greatest number of units allowed under the zoning ordinance, specific plan, or land use element of the general plan as of the date of application."  This makes clear the phrase "as of the date of application" refers to the "greatest number of units allowed" under the listed land use provisions, not the state law

definition of "maximum allowable residential density" itself. Accordingly, we reject the City's assumption that we should not apply the current state density bonus law.

In sum, under state law the general zoning ordinance, not the redevelopment plan, is the "applicable zoning" (§ 15332, subd. (a)) for this particular project on the issue of density. The City's reliance on the zoning ordinance rather than the redevelopment plan when determining the project's maximum allowable density therefore is not grounds to deny a Class 32 CEQA exemption.[25]

### c. *State law preempts the redevelopment plan's density bonus requirements*

After consideration of additional briefing we requested from the parties, we conclude the state density bonus law preempts the redevelopment plan to the extent the plan requires the City to make the findings under section 1306 of the plan before granting a density bonus under the state and City density bonus laws. In their additional briefing, appellants and respondents agree with this conclusion.[26]

_____

[25] We emphasize our holding is based on City law as it existed as the time of project application. We express no opinion whether the analysis would be different for projects applying for a density bonus after enactment of LAMC section 11.5.14, an issue that is not before us.

[26] In their original briefs and their supplemental briefs following transfer from the Supreme Court, the parties did not raise or address whether the state density bonus law preempts the redevelopment plan's density bonus provision. Rather, appellants argued the City had failed to determine the project

Section 1306 of the plan allows a density bonus of an unspecified quantity if certain findings are made regarding, inter alia, the project's contribution to the plan's "revitalization goals," whether the project will contribute to "neighborhood stability" and "avoid excessively dense development," and whether the project provides "appropriate parking." (Hoover Redevelopment Plan, *supra*, § 1306.)

Government Code section 65915, subdivision (a)(2) provides, "A local government shall not condition the submission, review, or approval of an application pursuant to this chapter on the preparation of an additional report or study that is not otherwise required by state law, including this section." This language on its face prohibits a locality from requiring findings beyond what state law requires to grant a density bonus. In *Schreiber*, *supra*, 69 Cal.App.5th 549, for example, the Court of Appeal held state law preempted a city ordinance requiring a density bonus applicant to prove the economic necessity of an incentive requested under the state density bonus law, a requirement not in the state density bonus law itself. (*Id.* at p. 558.) Here, also, the redevelopment plan requires findings in support of a density bonus that are not required under state law. Because the redevelopment plan "increas[es] the requirements to obtain [the state density bonus law's] benefits," it is preempted. (*Ibid.*)

Our preemption analysis is confined to the issue before us, where an applicant seeks a mandatory density bonus under the state and/or City density bonus provisions. We express no

_____

satisfied section 1306 of the redevelopment plan, and respondents argued other findings by the City effectively satisfied that section.

opinion whether an applicant seeking a greater density bonus from the City beyond the bonus mandated under the state density bonus law must meet the criteria in the redevelopment plan.

### 6. The Class 32 Exemption Must Be Set Aside Until the City Determines Redevelopment Plan Consistency

In conclusion, under current City law as reflected in LAMC section 11.5.14, the City cannot grant a Class 32 CEQA exemption unless it determines the project is consistent with the redevelopment plan. The Supreme Court has directed that we apply current law in mandamus proceedings (*Make UC II*, *supra*, 16 Cal.5th at p. 55), a rule intended to "prevent the appellate courts from issuing orders for the construction of improvements contrary to presently existing legislative provisions." (*Fairbank*, *supra*, 75 Cal.App.4th at p. 1257, fn. 12.)

We recognize that based on the state density bonus law, we have ruled in respondents' favor on the only inconsistency appellants have identified on appeal, that is, the inconsistency between the project and the redevelopment plan's density limitations. We have also rejected appellants' other challenges to the City's approval of the Class 32 exemption. In a non-CEQA case, these circumstances might normally lead to a straight affirmance.

CEQA, however, requires a different disposition when an agency has failed to make a determination required by CEQA. As our Supreme Court has counseled, " '[W]hen an agency fails to proceed [as CEQA requires], harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed

decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial. [Citations.]' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515.) An agency may overcome that showing of prejudice by demonstrating the omitted information was immaterial, but the burden is on the agency to do so. (See *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 488 ["it is the burden of the agency that erroneously omitted the [information] to establish [the information is] merely duplicative]"].)

As discussed, respondents argue we should affirm and not remand for any further findings because the redevelopment plan does not apply to the Class 32 exemption analysis in this case, or alternatively, a future redevelopment plan consistency analysis conducted as part of the building permit process will retroactively satisfy CEQA's requirements. We have rejected both arguments. Consistent with Supreme Court authority, we thus instruct the trial court to grant a writ setting aside the Class 32 exemption and directing the City to determine redevelopment plan consistency before reinstating the exemption.

The scope of remand is cabined by our holdings in this opinion. The sole issue upon which the City must make further findings before reinstating the Class 32 exemption is redevelopment plan consistency. Appellants may not raise challenges to the Class 32 exemption beyond redevelopment plan consistency, nor may they relitigate the challenges we have rejected herein. Our opinion further forecloses argument that the project's inconsistency with the redevelopment plan's base density or density bonus requirements precludes application of the Class 32 exemption.

As noted, the City has imposed as a condition of approval that the planning department determine redevelopment plan consistency before granting the project a building permit. Our limited remand thus should not impose any additional burden or delay.

## F.     Substantial Evidence Supports the Conclusion That the Project Will Not Have Significant Traffic Effects

Appellants argue the record lacks substantial evidence that the project would not create significant traffic effects, one of the criterion for the Class 32 exemption to apply under section 15332, subdivision (d). Specifically, appellants contend there is no evidence the project will not cause safety hazards due to increased traffic and insufficient parking. We disagree.

The record contains a transportation impact study dated June 2018. The study found the project "is estimated to generate a total 1,126 net new daily weekday trips, including 12 morning peak hour trips and 75 afternoon peak hour trips." The study concluded, "Based on [Los Angeles Department of Transportation] significance criteria, the Project is not anticipated to result in a significant impact at any of the six study intersections . . . . Therefore, no mitigation measures are required." The study reached a similar conclusion regarding future traffic conditions. The study found "[t]he Project provides adequate internal circulation to accommodate vehicular traffic without impeding through traffic movements on City streets."

The record also contains a parking demand study dated May 3, 2018. The study stated the project would provide

63

approximately 259[27] parking spaces for an estimated 584 to 990 tenants. The study compared the project's proposed number of parking spaces with "observed parking demand" at comparable nearby housing locations as well as municipal code requirements. The study concluded the project provided 34% more parking spaces than required under the municipal code. The project also provided more spaces per bedroom than were observed at three existing housing locations, all of which were observed to have sufficient parking based on "the maximum observed weekday parking occupancy."

These studies are substantial evidence in support of the City's finding that the project would not result in significant traffic effects.

Appellants' primary argument to the contrary is that the studies did not account for public comments indicating the project's neighborhood already suffers from insufficient parking and hazards caused by, for example, vehicles double parking or circling while looking for parking. Appellants also argue the traffic study focused solely on congestion, without evaluating traffic safety. Implicit in the parking study's conclusion, however, that the project provides sufficient parking, is that the project will *not* appreciably increase the number of motorists searching for on-street parking. Similarly, the traffic study's conclusion that the project would not result in a significant increase in traffic supports the inference that there will be no significant increase in traffic dangers either.

---

[27] The revised project reduced the number of parking spaces to 255.

We acknowledge that the traffic study concluded the project will result in *some* increase in traffic, but to negate a Class 32 exemption, that increase would have to be *significant*. The study concluded the increase would not be significant under the applicable standards. Again, this is substantial evidence in support of the City's finding of CEQA exemption.

Appellants question the validity of the parking study, noting the discrepancy between 990 tenants and 259 parking spaces and citing, inter alia, a statement by the Land Use and Planning Executive Director for USC that the study underestimates the project's parking needs and likely traffic impacts. It is not our role in conducting substantial evidence review to assess the credibility of evidence, or reweigh it against contrary evidence. The City had the full study and could evaluate how much weight to afford it. For the same reason, appellants' citations to statements and evidence regarding traffic concerns from other parties opposed to the project do not carry the day given the applicable standard of review.

Appellants argue the City has acknowledged the hazards created by the lack of parking in the project area because the project falls within a neighborhood stabilization overlay district (NSO) pursuant to LAMC section 13.12. NSOs are intended to address impacts caused by "multi-habitable room projects" in neighborhoods "proximate to colleges and universities." (LAMC, § 13.12, subd. (A).) Among other things, projects within NSOs must provide additional parking beyond the City's general parking requirements. (*Id.*, subd. (C)(2).)

Appellants concede the project meets criteria under the state density bonus law such that it does not have to comply with

65

the NSO parking requirements.[28]  Instead, they argue the City nonetheless must address the impacts the NSO's parking requirements are intended to ameliorate.  Substantial evidence supports that the City did so.  The parking study expressly concluded the project has sufficient parking, not based merely on the project's compliance with the municipal code, but also on observed parking needs at other residential buildings the study deemed comparable.  Assuming arguendo the project area has existing problems with insufficient parking, the parking study is substantial evidence that the project will not significantly exacerbate that problem.

## G.    The Record Lacks Substantial Evidence the Project May Adversely Impact a Historical Resource

Appellants argue the project may adversely impact various nearby historical resources, thus falling within an exception to the Class 32 exemption.  We disagree because appellants' supporting evidence is insufficient to support a fair argument that the project would adversely impact a historical resource.

### 1.    Applicable law

As previously noted, a project otherwise subject to a Class 32 exemption nonetheless must undergo environmental review if the project "may cause a substantial adverse change in the significance of a historical resource."  (§ 15300.2, subd. (f).)

A resource is historical if it is "listed in, or determined to be eligible by the State Historical Resources Commission, for listing

---

[28]  We accept appellants' concession for purposes of this appeal, and express no opinion as to the interplay of the NSO and state density bonus law.

in the California Register of Historical Resources." (§ 15064.5, subd. (a)(1).) A resource is presumptively historical if it is included in a local register of historical resources, or identified as significant in a historical resource survey, absent a preponderance of evidence to the contrary. (*Id.*, subd. (a)(2).) If an "object, building, structure, site, area, place, record, or manuscript" does not meet either of the above criteria, a lead agency[29] may nonetheless determine it is a historical resource if that determination is supported by substantial evidence. (§ 15064.5, subd. (a)(3)–(4).)

"Generally, a resource shall be considered by the lead agency to be 'historically significant' if the resource meets the criteria for listing on the California Register of Historical Resources [citation] including the following: [¶] (A) Is associated with events that have made a significant contribution to the broad patterns of California's history and cultural heritage; [¶] (B) Is associated with the lives of persons important in our past; [¶] (C) Embodies the distinctive characteristics of a type, period, region, or method of construction, or represents the work of an important creative individual, or possesses high artistic values; or [¶] (D) Has yielded, or may be likely to yield, information important in prehistory or history." (§ 15064.5, subd. (a)(3).)

"Substantial adverse change in the significance of an historical resource means physical demolition, destruction, relocation, or alteration of the resource or its immediate

---

[29] " 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project. The lead agency will decide whether an EIR or negative declaration will be required for the project and will cause the document to be prepared." (§ 15367.)

surroundings such that the significance of an historical resource would be materially impaired."  (§ 15064.5, subd. (b)(1).) Material impairment of a historical resource occurs when a project "[d]emolishes or materially alters in an adverse manner those physical characteristics of an historical resource that convey its historical significance" and entitle it to be included in the California Register of Historical Resources or similar local registers.  (*Id.*, subd. (b)(2).)

When reviewing a determination that the historical resources exception does not apply, we apply a bifurcated standard.  We review for substantial evidence an agency's determination that a resource is or is not a historical resource.  (*Friends of Willow Glen Trestle v. City of San Jose* (2016) 2 Cal.App.5th 457, 473.)  If a resource is determined to be a historical resource, "the fair argument standard applies to the question whether the proposed project 'may cause a substantial adverse change in the significance of an historical resource' [citation] . . . ."  (*Valley Advocates v. City of Fresno* (2008) 160 Cal.App.4th 1039, 1072; see *Berkeley Hillside*, *supra,* 60 Cal.4th at p. 1117 [citing *Valley Advocates* to support a bifurcated standard of review for the unusual circumstances exception].)

The fair argument standard "presents a legal question, i.e., the sufficiency of the evidence to support a fair argument" that the project would have a significant environmental impact.  (*Lucas v. City of Pomona* (2023) 92 Cal.App.5th 508, 537.) "[U]nder this standard, deference to the agency's determination is not appropriate and its decision [not to conduct further environmental review] can be upheld only when there is no credible evidence to the contrary."  (*Ibid.*)  "The fair argument

68

standard thus creates a low threshold for requiring an EIR, reflecting the legislative preference for resolving doubts in favor of environmental review." (*Covina Residents for Responsible Development v. City of Covina* (2018) 21 Cal.App.5th 712, 723.)

## 2. Additional background

### a. *City's findings and supporting evidence*

The City found the project site was "not located in a designated Historic Preservation Overlay Zone or on a site designated as historic on any federal, state, or local database." The City noted the sole structure on the site was built in 1971, and according to a study conducted by the Historic Resources Group, "is not eligible for historic designation at the local, state, or national level." The City concluded, "The Project would not cause a substantial adverse change in the significance of a historical resource."

A second report by the Historic Resources Group assessed potential impacts on nearby historical resources. The report identified as nearby historical resources two historic districts, one historic preservation overlay zone, and 14 historical structures. The southern border of the historic preservation overlay zone is immediately across the street from the project site. The two historic districts lie within the historic preservation overlay zone, with the southern border of one district across the street diagonally from the project site, and the other a block away. Several of the historical buildings are on lots immediately adjacent to the project site. The other buildings are across the street or within a block or so of the project site.

The report stated, "Because the Project would add height and density on parcels that are currently occupied by a two-story

69

institutional building and an associated surface parking area, the immediate surroundings of the adjacent historical resources identified in this report would be altered."

The report then discussed each identified historical resource, concluding any alteration to the surroundings caused by the project would not materially impair the integrity or significance of the resource. The report noted the project was physically separated from the historic zone and districts by West Adams Boulevard and therefore would not affect them apart from being somewhat visible from certain locations within those historic areas. The project would not alter or obscure the historic primary facades of the immediately adjacent structures. The remaining historical structures are "separated from the Project by streets and other developed parcels," and thus "there is no potential impact from the proposed Project on their historic integrity or ability to convey significance."

### ***b.*** *Appellants' evidence*

In their appellate briefing, appellants identify the following evidence as supporting a fair argument that the project will have an adverse impact on historical resources.

Jim Childs, the appellant in the administrative appeals challenging the City's approvals, submitted a letter identifying historic buildings and monuments neighboring, or close to the project. In addition to the historical zones and districts discussed above, Childs identified two other designated historic districts "[l]ess than two blocks to the west" of the project, and a district south of the project that Childs claimed was eligible for historical designation. Childs contended the project did not satisfy any of the "specific guidelines" for the historic overlay zones he identified.

70

In another letter, Childs stated the project "is a negative intrusion to the character[-]defining historic streetscape of West Adams Boulevard," and "does not respect the historic streetscape of Severance Street." Childs cited in particular the project's podium parking, which raised the project to a "non-compatible 4-story height." In another letter, Childs noted the "very generous depth of front setback" on nearby properties, which the project itself did not have.

Mitzi March Mogul, who identified herself as a historic preservation consultant, submitted a letter acknowledging the project site contained no historic resources and was not within a historical preservation zone, but objecting that the City had not adequately considered the project's impact on surrounding historical resources. Mogul contended the nearby historical resources "would be substantially damaged in terms of their context, ambiance, environment (ie shade/shadow) and in some cases, quality of life." "A 4-story contemporary building looming over a 2-story historic building is a major impact," and "traffic, noise, and other human-induced actions and effects will alter the quality of life for those occupying the historic structures as well as the way that others will experience the historic structures." In a second letter, Mogul contended, "The oversized and incompatible development could adversely impact the historic significance of the surrounding historic resources, both at a project level and cumulatively."

The Board of the University Park Historic Preservation Overlay Zone (HPOZ Board) submitted a letter contending the project, although not within the preservation zone, would be immediately adjacent to the zone and therefore "will impact the Zone in its character, compatibility and traffic. You cannot

71

visually separate one side of the street from the other in terms of impacts to aesthetics, population and land use, and traffic." "The design of the project is completely inappropriate for Adams Boulevard, which was developed as an attractive residential streetscape and remains an important boulevard for the neighborhood."

The HPOZ Board stated that the project's setback was not consistent with "the pattern of development along this Scenic Highway," and was "extremely over-built for the community." The board objected to the podium parking, which "rarely exists in University Park."

A commenter identifying herself as a member of the local neighborhood council stated the project was within "a legacy neighborhood" with historic buildings and monuments, and the project would "affect[ ] . . . the feeling and association and location of these historic buildings." The owner of a nearby "housing community" stated, "The historic character of the surrounding neighborhood begs for something different than the 'glass and brass' building" contemplated by the project. A realtor noted the "significant landmark properties" along Adams Boulevard near the project site, and argued the project was incompatible in terms of size, podium parking, and lack of sufficient setback. The North University Park Community Association submitted a letter objecting that the project's position relative to Adams Boulevard, including its setback, was "not in keeping with the pattern of development along this Scenic Highway."

### 3.    Analysis

The reports by the Historic Resources Group are substantial evidence in support of the City's finding that the

72

project site itself does not contain historical resources and is not within a historical preservation overlay zone or designated historic district. Appellants concede as much, stating the project site's "history is not the subject of this litigation."

Appellants contend, however, that the project site is within the "immediate surroundings" of historical resources (§ 15064.5, subd. (b)(1)), and "there is substantial evidence of a fair argument that the Project would materially impair the integrity of the setting of these historic resources."

We accept arguendo the properties and historical zones and districts identified by the Historic Resources Group and in appellants' cited evidence constitute historical resources for purposes of CEQA. We nonetheless conclude appellants' cited evidence is insufficient to support a fair argument the project will materially impair those resources.

Instructive is *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357 (*Eureka Citizens*), which concerned the adequacy of an EIR evaluating an outdoor playground. (*Id.* at p. 363.) Among other arguments, the appellants, a group objecting to the playground, contended the city "failed to analyze the impact of the Project on the 'historic character' of the neighborhood." (*Id.* at p. 374.) In support, the appellants cited an expert study they had commissioned. (*Ibid.*)

The Court of Appeal held the study did not establish the playground had materially impaired a historical resource. (*Eureka Citizens*, *supra*, 147 Cal.App.4th at p. 374.)[30] The study

---

[30] The published portion of *Eureka Citizens* does not specify the standard of review the appellate court applied to the historical resource impact argument. It appears, however, the

73

identified "53 historically significant *structures* in the 30 block general neighborhood of the Project," but "posits no damage to, or impairment of, any of them. Certainly it does not, and could not, suggest that the Project contemplated any demolition of, or material alteration of, the physical characteristics of the identified historically significant structures. Contrary to appellants' argument, the only conclusion expressed in the study was that the prairie addition neighborhood [comprised of 20 residences surrounding the subject playground] was 'culturally significant,' and that 'The size, bright color, and lack of setbacks . . . create a neighborhood intrusion.' " (*Eureka Citizens*, at pp. 364–365, 374–375.)

The court continued, "Nothing in the study indicates that the *neighborhood*, as opposed to individual structures within it, meets the Guidelines definition for a 'historical resource,' and it was never identified as such by the City as the lead agency." (*Eureka Citizens*, *supra*, 147 Cal.App.4th at p. 375.) The court agreed with the city that "the evidence cited by appellants 'simply does not create the possibility that the Project will in some way make any structure less historic . . . .' " (*Ibid.*)

The evidence cited by appellants in the instant case is analogous to the evidence found wanting in *Eureka Citizens*. The crux of the public comments cited by appellants is that the project does not look like other properties in the neighborhood, noting that it is larger, with smaller setbacks, and with an above-ground podium parking structure. These comments are akin to

court evaluated the argument under a de facto fair argument standard, because the court looked to whether the appellants' cited evidence, i.e., their commissioned study, demonstrated a possibility of an adverse impact on a historical resource.

74

the evidence in *Eureka Citizens* that the playground's " 'size, bright color, and lack of setbacks . . . create a neighborhood intrusion.' " (*Eureka Citizens*, *supra*, 147 Cal.App.4th at p. 375.)

Absent from appellants' cited evidence is virtually any discussion of how the fact that the project does not look like nearby buildings somehow "[d]emolishes or materially alters in an adverse manner those physical characteristics of an historical resource that convey its historical significance" and entitle it to be included in the California Register of Historical Resources or similar local registers. (§ 15064.5, subd. (b)(2).) Appellants offer no evidence that construction of a contemporary building " 'will in some way make any [nearby] structure less historic . . . .' " (*Eureka Citizens*, *supra*, 147 Cal.App.4th at p. 375.)

Nor does the evidence suggest the project will obscure nearby historical buildings. At best, commenter Mogul stated generally that the project would "shade" or "shadow" nearby buildings, and "[a] 4-story contemporary building looming over a 2-story historic building is a major impact." These unspecific, conclusory comments, without discussion of particular structures and how the project's alleged "looming" over them affects their ability to convey their historical significance, are insufficient to support a fair argument of material impact.

Also unavailing are the public comments suggesting the project will materially impair the historical protection zone and districts across the street. Here, again, the contention is that the project adversely impacts the zone and districts because it is visually incompatible with them. Were we to accept this contention, we would effectively extend the protections of the historic zone and districts to include areas outside the zone and districts that are nonetheless visible to those within or near to

the zone and districts. If advocates wish to increase the borders of the zone and districts, they may of course petition the appropriate agencies. We, however, will not do so under the guise of a CEQA evaluation, at least not based on the conclusory statements cited by appellants.

To the extent the comments cited by appellants suggest the area encompassing the project site itself, as opposed to certain structures within it, is of historical significance, those comments, again, are conclusory, and lack any argument or authority suggesting the project site is within an area eligible for historical designation. The mere fact that the area contains structures that are themselves historical does not establish the neighborhood itself is historical.

The City contends none of the public commenters is an expert qualified to opine on historical resources impact. Given our conclusion that the comments, expert or not, are insufficient to support a fair argument of historical resource impact, we do not reach this argument.

## H. Cumulative Impact

Finally, appellants argue the Class 32 exemption does not apply because "the cumulative impact of successive projects of the same type in the same place, over time is significant." (§ 15300.2, subd. (b).) Appellants' cumulative impact argument reasserts their arguments that the project will exacerbate existing traffic and parking problems, and along with similar projects, would adversely impact the immediate surroundings of historical resources.

*Aptos Residents Assn. v. County of Santa Cruz* (2018) 20 Cal.App.5th 1039 (*Aptos Residents*) held that the cumulative impact exception is subject to a bifurcated standard of review

similar to that discussed above for the historical resource impact exception. (*Id.* at p. 1048.) *Aptos Residents* analogized its standard of review to the standard of review the Supreme Court applied to the unusual circumstances exception in *Berkeley Hillside*. (*Aptos Residents*, at pp. 1048–1049.) Under that standard, we review an agency's determination that unusual circumstances do or do not exist for substantial evidence. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114; *Aptos Residents*, at p. 1048.) Whether an unusual circumstance will produce a significant effect, however, is evaluated under the fair argument standard. (*Berkeley Hillside*, at p. 1115; *Aptos Residents*, at pp. 1048–1049.)

*Aptos Residents* does not specify to what finding we apply the substantial evidence standard when evaluating the cumulative impact exception. The *Aptos Residents* court merely stated, "[W]here an exception is predicated on a factual issue, we apply a traditional substantial evidence standard." (*Aptos Residents*, *supra*, 20 Cal.App.5th at p. 1049.)

Appellants contend we should review for substantial evidence whether there is an existing cumulative impact in the area of the project site; if there is, we should assess under the fair argument standard whether the project would contribute to that impact. Respondents offer a somewhat different formulation, in which we review for substantial evidence whether there is "cumulative impact of successive projects of the same type in the same place, over time," (§ 15300.2, subd. (b)) and if so, evaluate for fair argument whether that cumulative impact is significant.

We will accept arguendo appellants' position that at the first step of our analysis we review whether substantial evidence supports a finding of no existing cumulative impacts. We agree

with respondents that the definition of "cumulative impact[s]" refers to "impact[s from] successive projects of the same type [as the subject project] in the same place over time." (§ 15300.2, subd. (b).)

Appellants argue the City already has acknowledged the existence of cumulative parking impacts by designating the area containing the project as a neighborhood stabilization overlay district (NSO), which, again, is intended to address impacts caused by "multi-habitable room projects" in neighborhoods "proximate to colleges and universities," including by requiring additional parking. (LAMC, § 13.12, subds. (A), (C)(2).) To establish an NSO, the City must determine, inter alia, that the area to which the NSO will apply "is negatively impacted by excessive on-street parking resulting from residential units designed for student housing, which do not provide adequate off-street parking." (*Id.*, subd. (B)(5).)

The City found, however, in reliance on the parking study, that the project did provide adequate off-street parking. Thus, it is not a project of the "same type" (§ 15300.2, subd. (b)) as that addressed by the NSO, that is, student housing that does *not* provide adequate off-street parking. Put another way, although the NSO arguably is evidence of cumulative impact by student housing with inadequate parking, that category does not include the project in the instant case.

Appellants argue the project does not in fact provide adequate parking under the NSO, which requires "one additional parking space for each habitable room at or above five habitable rooms." (LAMC, § 13.12, subd. (C)(2).) Again, appellants concede the project is exempt from the NSO by virtue of providing a certain number of affordable units in accordance with the state

78

density bonus law.  Appellants argue, however, "Regardless of whether the inclusion of a few affordable units overrides the specific parking requirements of the NSO, it does not eliminate the cumulative impacts the NSO was adopted to address."

As previously discussed, however, the parking study on which the City relied did not find the project's parking is adequate merely because it satisfies legal requirements.  The study also evaluated parking at other, similar residential complexes and concluded the project provided sufficient parking based on that comparison.  The study is substantial evidence that the project has adequate parking, and is not the "same type" of project covered by the NSO.

Appellants further argue the City's designation of Adams Boulevard and other nearby streets as "High Injury" streets is evidence of cumulative traffic safety impacts.  Even, for argument's sake, were we to accept this contention as true, it would not be evidence that the streets are dangerous because of student housing.  The traffic study, moreover, considered not only present traffic conditions, but also future predicted conditions, based on "related present and future development projects that are proposed, approved, or under construction," as well as "regional growth projections."  The traffic study therefore addressed potential cumulative impacts caused by the project and "related present and future development projects," and concluded there would not be significant impacts.  This is substantial evidence there is not a cumulative impact on traffic safety caused by developments like the project at issue in the instant case.

We reject appellants' argument that the project and others like it cumulatively will adversely impact historical resources.  As previously discussed, even under the deferential fair argument standard, appellants have failed to explain how the project will have *any* adverse impact on nearby historical resources.  In the absence of evidence of any adverse impact at all, we cannot conclude additional, similar projects would lead to a cumulative impact.

## DISPOSITION

The judgment is reversed.  The matter is remanded and the trial court is instructed to issue a writ of mandate directing the City of Los Angeles to set aside its grant of a Class 32 CEQA exemption to the subject project, and further directing the City not to reinstate the exemption without first determining the project is consistent with the Exposition/University Park Redevelopment Plan in accordance with the holdings in this opinion.  The trial court shall retain jurisdiction over the proceedings by way of a return to the writ.  The parties shall bear their own costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.                    WEINGART, J.

80